# ERNESTA SENTIERI v. OLIVER IRON MINING COMPANY.[1]

November 24, 1937.

No. 31,426.

*Dennis F. Donovan,* for relator.
*Austin & Wangensteen,* for respondent.

HOLT, JUSTICE.

*Certiorari* to review a decision of the industrial commission awarding respondent compensation for the death by accident of her husband, Erminio Sentieri, on December 11, 1935, while employed by relator in its underground Godfrey Mine.

[1]Reported in 276 N. W. 210.

We shall refer to respondent's husband as the employe and to relator as employer. In answer to the petition for compensation the employer expressly denied that the employe met with an accident arising out of and during the course of the employment, and expressly alleged that his death did not arise out of or during the course of his employment and had no connection therewith and was entirely extraneous thereto. The answer also alleged on information and belief that the coroner's jury returned a verdict to the effect that the employe's death was due to intentional self-inflicted injuries. The referee, by finding No. III, found that the employe's death was not the result of an accident and injury arising out of and in the course of the employment. The industrial commission, on appeal, vacated this finding of the referee and substituted in place thereof the following:

"III. That on December 11, 1935, Erminio Sentieri, the above named employe, sustained an accidental injury to his person arising out of and during the course of his said employment resulting in his immediate death on that date."

Then follows the award to respondent and her two dependent minor children.

One assignment of error challenges the finding quoted as not sustained by the evidence. Another assignment is that the commission placed a greater burden of proof on the employer than the law requires. The first two assignments of error, to the effect that the commission erred in vacating finding No. III of the referee and his order denying compensation, are of no value in this court for, on appeal from the referee to the commission, there is a trial *de novo,* and the commission is the fact-finding body upon the record before it. Its award is based upon its own findings of fact and such of the referee as it adopts.

There are certain facts not in dispute, *viz.:* That respondent is the widow of the employe and the mother of two minor children; that, if entitled to compensation, the award is correct in amount; that shortly before one o'clock, December 11, 1935, the employe of relator was found dead in a place where he had the right to go in

his work, his heart and vital organs eviscerated by explosives that had torn a large hole in his chest and cut off his left hand. To a better understanding of the situation it should be said that the testimony disclosed that contract No. 2, upon which the employe and John Repto were and had been mining, was in a drift about 110 feet below the surface. A mining drift in this mine means a tunnel 14 to 16 feet high and 10 or 11 feet wide where the iron ore has been removed. To support the sides and ceiling or roof of the tunnel, two heavy upright timbers with a like timber on top, called "cap," are erected every six feet. Lagging or other protection is inserted between the cap timbers and uprights so that, while removing the ore blasted and boring the holes for the next blast, the workmen may be protected from falling ore or rock. These tunnels or drifts resemble corridors. There was such a corridor running east and west through this mine, almost 1,000 feet long, extending from an elevator at one end to a shaft at the other leading to the surface. At right angles about the middle of this east and west corridor and running north, was a corridor or drift worked under contract No. 2. It extended north about 100 feet from the east and west corridor and then turned east at right angles to mine a 20- or 22-foot ore body or pillar. The south half of this pillar had been mined, and at the time in question the north half had been mined some 12 feet to the east of the north corridor. Just before noon on the tenth of December the employe and Repto had blasted down about six feet of the breast, producing a pile of loose ore about seven and one-half feet high and extending to within about six feet of the east posts of the north corridor. The afternoon of the 10th and the forenoon of the 11th had been spent by these men in making safe the side and ceiling, where the blast took effect, while removing the loose ore, about half of which remained to be removed when the men went to the surface to eat lunch in the dryhouse. The superintendent stated that but one shift was working, and that the working hours were from eight in the morning until five in the afternoon, with an hour for lunch, but, since the mine was worked on contract, no time was kept, the men being paid by the amount of ore removed each day. Directly across

from the north corridor a stub drift had been mined, south of the east and west corridor mentioned, for 37½ feet. At one side of the entrance of this stub corridor was a pile of lagging and wedges for the use of those on contract No. 2 and two other contracts. Farther in was stored a tramcar, and on the west side of the corridor were first a large powder or dynamite box, then a smaller dynamite box empty, next to it a plank seat, and near it a coil of steel cable. Slumped against or from this seat, his hat on the seat with the brim shattered, and his carbide lamp in the empty dynamite box, the employe was found. There is some uncertainty about the exact position of the body before the coroner straightened it out. There was the testimony of Repto that when they left for lunch he placed the ax against the post in the corridor some 20 feet from the ore pile and that the employe asked to borrow Repto's knife. When Repto returned, to find his partner dead, the ax was on the ore pile, and also on the pile was 68 inches of fuse not there when they left for lunch. A string similar to those used to lace the fuse to a dynamite stick was found halfway between the ore pile and the post where Repto had left the ax. The fuses for contract No. 2 were kept in a tin box hung on a post in the north corridor some 70 feet south of the ore pile on which were found the ax and fuse. These fuses were cut in six-foot lengths by a special employe, with a machine, at another place in the mine, and a cap crimped to each fuse ready to insert into a dynamite stick. On this same post the employe had hung his jacket after coming from lunch. The dynamite sticks for contract No. 2 were issued to the men weekly and were kept in the large box in the stub corridor. The theory of relator is that the employe took the ax to cut off the four-inch end of the fuse to which the cap was crimped, threw the ax and the remainder of the fuse on the ore pile, then went deliberately to the stub corridor to kill himself.

Respondent had the burden of proving that the death of her husband was caused by an accident arising out of and in the course of the employment. If the evidence adduced indicated self-destruction on the part of the employe, the presumption against suicide disappears, and it was for the commission to find as a fact whether

death was caused from an accident arising out of and in the course of the employment. The finding No. III, made by the commission, of course negatives suicide. The proof shows no motive for self-destruction. The testimony of Repto that the employe complained that morning of ill-health and of the one who deemed him morose or depressed at lunch time appears weak, and the triers of fact could well conclude from the evidence adduced by respondent that the employe was in good health, had no financial or other worries, was living happily with his wife and children, and was of a cheerful, though quiet, disposition. When suicide was discarded, the conclusion could readily be reached of an accident arising out of and in the course of Sentieri's employment. An underground miner is exposed to accidents from many causes, not the least from the explosives necessarily used. There was conflicting evidence respecting the use of pop blasts in this mine. It is not to be denied that the commission might have found the employe a suicide; but an attentive examination of the record is convincing that such a finding is not compelled. In view of 1 Mason Minn. St. 1927, § 4269, which provides that the employer shall pay compensation in every case of personal injury or death to his employe "caused by accident, arising out of and in the course of employment, without regard to the question of negligence, except accidents which are intentionally self-inflicted or when the intoxication of such employe is the natural or proximate cause of the injury, and the burden of proof of such fact shall be upon the employer," it is readily seen that if the inference from the facts proved is more consistent with an unintended mishap than a design at self-destruction, the former will be adopted. No one saw or heard of this fatal blast. The case was exhaustively tried, and much evidence, expert and otherwise, introduced to aid the commission to a right conclusion. The following workmen's compensation cases, where the vital issue was whether the accident causing death arose out of and in the course of the employment, are cited: State ex rel. Oliver I. Min. Co. v. District Court (Arko case), 138 Minn. 138, 164 N. W. 582; Hawkins v. Kronick Cleaning & Laundry Co. 157 Minn. 33, 195 N. W. 766, 36 A. L. R. 394; Samsa v. Hanna Ore Min. Co. 172 Minn. 185, 214

N. W. 775; Rautio v. International Harvester Co. 180 Minn. 400, 231 N. W. 214; Anderson v. Russell-Miller Milling Co. 196 Minn. 358, 267 N. W. 501. In each of these cases the findings upon the issue of whether or not the accident which caused death of the employe arose out of and in the course of the employment was sustained except in the Rautio case, and in that case the evidence was held conclusive that Rautio wrongfully entered the part of the mine from which he had been positively excluded because of a threatened cave-in. The Anderson case was decided by the commission on the same theory, namely, that the employe forced himself into the mill, his usual place of work, when to his knowledge it had been closed to employes while being fumigated with a deadly poison.

We are not impressed with relator's point that the commission placed a more onerous burden of proof upon it than required by law. A decision of authoritative worth concerning a provision of a workmen's compensation act similar to ours is considered in Del Vecchio v. Bowers, 296 U. S. 280, 284, 56 S. Ct. 190, 193, 80 L. ed. 229. The act there provided: "No compensation shall be payable if the injury was occasioned solely * * * by the willful intention of the employe to injure or kill himself or another," and in another section in the same act it is provided that in a compensation proceeding, "it shall be presumed, in the absence of substantial evidence to the contrary—* * * (d) That the injury was not occasioned by the willful intention of the injured employe to injure or kill himself or another." There a deputy commissioner was the trier of facts. The court says [296 U. S. 285] :

"In the present instance, the fact that the wound was self-inflicted permits but one of two conclusions: either the decedent accidentally killed himself, or he committed suicide. Considerations of fairness and experience in human affairs induce fact-finding bodies, where there is a balance of probability, to adopt a working assumption as the basis of a conclusion, unless and until the facts are developed by evidence. The natural love of life, the comparative infrequency of suicide as contrasted with accident, and the

likelihood that testimony as to the cause of death would be more readily available to the employer than to the claimant, justify a presumption, which the law indulges in such a case, that the death was accidental. The act under consideration, however, does not leave the matter to be determined by the general principles of law, but announces its own rule, to the effect that the claimant, in .the absence of substantial evidence to the contrary, shall have the benefit of the presumption of accidental death. The employer must rebut this *prima facies*. The statement in the act that the evidence to overcome the effect of the presumption must be substantial adds nothing to the well understood principle that a finding must be supported by evidence. Once the employer has carried his burden by offering testimony sufficient to justify a finding of suicide, the presumption falls out of the case. It never had and cannot acquire the attribute of evidence in the claimant's favor. Its only office is to control the result where there is an entire lack of competent evidence. If the employer alone adduces evidence which tends to support the theory of suicide, the case must be decided upon that evidence. Where the claimant offers substantial evidence in opposition, as was the case here, the issue must be resolved upon the whole body of proof pro and con; and if it permits an inference either way upon the question of suicide, the Deputy Commissioner and he alone is empowered to draw the inference; his decision as to the weight of the evidence may not be disturbed by the court."

The above states the attitude in which the commission is to apply the statute quoted in determining whether the employe was killed in an accident arising out of and in the course of his employment. We are persuaded from the record that the commission did not make the burden of proof more onerous for the employer than the law demands.

Relator insists that in the case at bar, as in the Rautio and Anderson cases, the evidence shows that the employe violated relator's rules and thus placed himself outside of the scope of the employment when the accident took place. A book of rules containing 35 printed pages was introduced in evidence. Each employe had been

given one of these books, with directions to study and strictly conform to the rules. These rules are designed for the laudable purpose of guarding the employes from accidental injuries and the employer from needless loss. But negligence of the employe is no defense to the paying of compensation for accidental injuries sustained in the employment. And the unintentional violation of a rule respecting the employe's work can be nothing more than mere negligence therein. If the violation of a rule or command of the employer is to exempt him from liability to pay compensation for his employe's accidental death which has been found not that of a suicide, there should be definite proof of the rule and of its wilful violation. Among the rules and regulations contained in the book, these are the ones pointed to as violated by the employe:

"70-U. Wherever possible, no one shall be allowed to blast even one hole, unless he has a partner with him, or very close to him, to assist him should it become necessary."

"71-U. No person shall be allowed to carry powder and caps at the same time, except when taking supplies into the stope or drift where the material is to be used. * * *"

"74-U. * * * Where powder and caps are kept at each contract, they must be kept in separate boxes, and powder boxes must be at least fifty feet apart and cap boxes at least 25 feet from powder boxes. * * *"

"80-U. * * * Minimum length of fuse to be 3 feet."

The book also contains a list of 28 "Don'ts" respecting explosives, among which relator points to this as having been disobeyed:

"12. Don't use a short fuse to hasten explosion, or with the idea that it is economical so to do."

Rules 70-U and 71-U contain exceptions on their face. There is not the slightest evidence of violation of rule 74-U. The entire contention of relator that the employe took himself out of the sphere of the employment must rest on his violation of rule 80-U and No. 12 of "Don'ts." 1 Mason Minn. St. 1927, § 4261, providing for compensation by the employer for accidental injury or death

to an employe arising out of and in the course of the employment, contains this exception: "Provided the employe was himself not wilfully negligent at the time of receiving such injury; and the question of whether the employe was wilfully negligent shall be one of fact" submitted to the trier of fact. Where, as here, the defense of suicide is negatived by the commission's finding, there is not much room for a finding that the employe wilfully disobeyed any rule or instruction which placed him outside the sphere of his employment at the time of the accident. The rules and instructions pointed to all related to the manner of conducting himself within the employment. Dunnell, Minn. Dig. (1932 Supp.) § 10400, states:

"There are prohibitions which limit the sphere of employment and prohibitions which only deal with conduct within the sphere of employment. A transgression of a prohibition of the latter class leaves the sphere of employment where it was, and consequently will not prevent the recovery of compensation."

As far as using a too short fuse, if such were the fact, it related to the manner of doing his work, and failure to do it as directed would be mere negligence. It would give full play to the doctrine of contributory negligence and defeat the object of the workmen's compensation act were it held that the mere failure or neglect to follow some safety rule or instruction with respect to the manner of doing the work in the employment took the employe outside the scope of his employment. Beci v. Mariski Iron Co. 161 Minn. 237, 201 N. W. 313; Olson v. Robinson, Straus & Co. 168 Minn. 114, 210 N. W. 64. The men working on contract No. 2 had the right to go into this stub corridor, where the employe met death, the dynamite for their use was kept therein, there is nothing to indicate that the employe intended to set off a blast at that place, the commission having negatived suicide. The evidence does not compel a finding that the employe wilfully disobeyed some safety rule or instruction of the employer which placed him outside the sphere of his employment.

The award is affirmed.

Respondent may tax $100 as attorneys' fees with her costs.

MR. JUSTICE LORING took no part in the consideration or decision of this case.