# WANDA GLADYS BEACH v. AMERICAN STEEL & WIRE DIVISION OF UNITED STATES STEEL CORPORATION AND STATE TREASURER, CUSTODIAN OF SPECIAL FUND.

78 N. W. (2d) 371.

July 6, 1956—No. 36,814.

*W. O. Bissonett,* for relator.
*Rodney J. Edwards* and *Lathers, Hoag, Gruber & Edwards,* for respondent.

KNUTSON, JUSTICE.

Certiorari to review a decision of the Industrial Commission awarding benefits to the dependents of a deceased employee.

Robert S. Beach was employed as a chemist by the American Steel and Wire Division of United States Steel Corporation. He had a degree in chemistry and also had some pharmaceutical training. He had been employed as a chemist for about seven years and, in June 1953, was promoted to the position of junior chemist. A junior chemist analyzes coke oven gases and tars and blast furnace gas. Beach, who was 36 years of age, was married in 1941 and was living with his wife and three children at the time of his death. His wife had been ill for some time but at that time was improving. On the morning of November 17, 1953, he left his home in Duluth for his work at 7:20 a. m. He drove his own car to the main gate of the plant where he worked. There he met a fellow employee named Wendell Sjoberg, and they walked together to the chemical laboratory, a distance of about three city blocks. Sjoberg testified that they conversed about ordinary things and that he saw nothing unusual about Beach.

Beach entered the laboratory building at 7:40 or 7:45 a. m. and went into the main laboratory, which is a large, almost square room with tables and other apparatus in the center of the room and an aisle extending entirely around the room about four feet from each wall. He entered through the door on the west side of the room, turned north and proceeded around the room, passing two night-shift chemists, James W. Krause and James E. Brophy, who were in the northwest corner. Chemicals, including potassium cyanide, were kept in a cabinet on the west wall between the entrance and the place where these two employees were sitting so that Beach passed the cabinet as he approached them. They exchanged morning greetings, and Brophy testified that Beach was very pale but that he did not appear to be nervous or despondent. Both testified that they did not see Beach stop at the chemical cabinet but they could not say that he had not done so. Beach then disappeared from their view behind a large exhaust hood at the far end of the room. The apparent purpose for his walk around the room was to plug in some hot plates which were used in the laboratory and which were located under this hood. He returned along the south side of the room and entered the gas laboratory through a door near the entrance door. He greeted another chemist employee named John E. Shunk, who testified that Beach said that he was not feeling too well but gave no indication of being nervous or worrying. Shunk left the gas laboratory before Beach. Beach then entered the locker room up-stairs, where he changed into work clothes while another employee, Floyd N. Odegard, was changing into street clothes. The two were together for about ten minutes but had no conversation other than to exchange greetings, which was about as usual. Beach appeared normal and all right. They closed their lockers at about the same time, Odegard then going downstairs, leaving Beach alone. Odegard testified that he had not observed any container either in Beach's hands or on the benches. In the hallway running from the bottom of the stairs leading to the locker room, Odegard passed Krause, one of the employees whom Beach had passed in the laboratory, who was then going upstairs. This was about 7:50 a. m.

When Krause reached the locker room he found Beach lying face down on the floor with his head between two sinks that were in the room. He turned Beach over and then went to summon an ambulance. He returned to assist Beach, who was then frothing at the mouth and vomiting. The ambulance soon arrived, and Beach was taken unconscious to the plant infirmary, where resuscitation efforts failed. None of those who went to the locker room to aid Beach observed any type of container lying around. An autopsy performed later the same morning indicated that the cause of death was hydrocyanic acid poisoning. This was confirmed by analysis of the stomach contents, which disclosed that there was enough cyanide in Beach's stomach to cause immediate death, although the exact amount was not determined.

Potassium cyanide is a salt, and it was kept in a glass jar about a quart size on the shelf of the cabinet above referred to, together with many other salts and minerals. The cabinet was not kept under lock and key and was not under supervision of any employee. Anyone who had need for the chemicals had access to the cabinet. When the salt is used it is put in liquid solution for the purpose of testing the nickel content in steel. Potassium cyanide is very poisonous, and, if taken into the mouth, it will cause death in less than a minute. It is generally recognized by chemists that, upon getting potassium cyanide into the system, it causes almost instantaneous death and that is true when taken into the mouth. There is evidence to show that all chemists are familiar with the lethal quality of potassium cyanide. In his work as a junior chemist, Beach had no occasion to use potassium cyanide although he may have used it in his prior work.

Mrs. Beach testified that her husband was of an even temperament and that their financial situation was reasonably satisfactory. She said that he had been around home through a three-day weekend preceding the day on which he died and that he did not appear to be nervous or despondent nor did she observe anything unusual about his actions. He enjoyed several hobbies. A psychiatrist was called and testified that in his opinion death probably was not due to

suicide for the reason that there appeared to be a complete lack of motive and that Beach apparently was a well-adjusted individual who would not be apt to commit suicide. The physician who performed the autopsy testified that cyanide can be taken in solution or as a solid and could enter the system through a cut or sore or could be inhaled as a gas. A few grains of the concentrate kept in the laboratory placed on the tongue would cause almost immediate death.

The referee who heard the testimony found that death did not arise out of and in the course of the employment. On appeal to the Industrial Commission, his decision was reversed, one member dissenting. Apparently the majority opinion was based on a failure of the employer to sustain its burden of proof that the injury was self-inflicted.

■ M. S. A. 176.021, subd. 1, reads:

"Except as excluded by this chapter all employers and employees are subject to the provisions of this chapter. Every such employer is liable for compensation according to the provisions of this chapter and is liable to pay compensation in every case of personal injury or death of his employee arising out of and in the course of employment without regard to the question of negligence, unless the injury or death was intentionally self-inflicted or when the intoxication of the employee is the proximate cause of the injury. The burden of proof of that fact is upon the employer."

Under this statutory provision the burden of proving self-destruction is placed upon the employer who asserts it. In such case the aid of the presumption against suicide is not needed. In the absence of any proof, the party having the burden must fail on that issue. Given proof from which an inference of suicide may be drawn, it becomes the duty of the factfinder to determine whether the burden has been sustained. The presumption against suicide is not evidence and cannot enlarge the burden of proof already resting on the one against whom the presumption normally would operate. If the evidence is conclusive one way or the other, a finding of suicide or lack of it follows as a matter of law from the statutory mandate placing

the burden on the employer without the aid of the presumption. While the commission in this case may have attached too much importance to the presumption against suicide, we do not think that it was prejudicial for the reason that the record is such as to support a finding that the burden of proving self-destruction has not been sustained. All that the evidence shows is the fact of death and the cause of it. There is no evidence showing any motive for self-destruction. Neither is there any evidence showing how the poison was taken. Whether it was by accident or suicide is left entirely in the field of conjecture. Under those circumstances, the burden of proof has not been sustained.

■ The next question presents more difficulty. It having been decided that the employer has not sustained its burden of proving suicide, does the evidence sustain a finding that death of the employee arose out of and in the course of his employment? The burden of proving causal connection between the death and the employment rests on the claimant.

■ Here, as on other questions of fact, we are governed by well-established rules pertaining to a review of a decision of the commission. The findings of the Industrial Commission are entitled to much weight and will not be disturbed unless manifestly contrary to the evidence.[1]

■ The function of this court is to determine only whether the findings have sufficient basis to permit an inference reasonably to be drawn from the facts.[2]

■ A finding of the commission on a question of fact must stand unless consideration of the evidence and the inferences permissible therefrom clearly requires reasonable minds to adopt a conclusion contrary to that reached by the commission.[3]

[1]Sobczyk v. City of Duluth, 245 Minn. 569, 73 N. W. (2d) 795; Graf v. Montgomery Ward & Co. Inc. 234 Minn. 485, 49 N. W. (2d) 797.

[2]Hansen v. Adent, 238 Minn. 540, 57 N. W. (2d) 681; Petro v. Martin Baking Co. 239 Minn. 307, 58 N. W. (2d) 731.

[3]Baburic v. Butler Brothers, 233 Minn. 304, 46 N. W. (2d) 661; Hansen v. Adent, *supra;* Koktavy v. City of New Prague, 246 Minn. 550, 75 N. W. (2d) 774.

■ There is no dispute in this case that death of the employee was caused by a deadly poison taken internally. It is hardly disputable that it was taken voluntarily either intentionally for the purpose of committing suicide or as a result of accident. Since we have found that the employer has failed to sustain its burden of proving suicide, it must follow that it was taken accidentally. The only causal relationship between the taking of the poison and the employment lies in the fact that potassium cyanide was used in the laboratory and was accessible to employee and all other employees working in the laboratory. While it is not shown how it could have been taken accidentally, the inference is permissible that it was taken for the purpose of relieving a distressed feeling in the belief that it was something else. While the causal connection is extremely thin, we cannot say that it is so devoid of reality that it lies entirely in the field of conjecture. The causal connection, thin as it is, rests on the proposition that potassium cyanide was used on the premises and could have been mistaken for some other drug to relieve a distressed feeling or that it was taken without knowledge that it was present.

The cases which we heretofore have decided involving the question of possible suicide are not helpful.[4] Nor are other cases that we have been able to find of much help.[5]

In Rittenberg v. Abbott Laboratories, 158 Pa. Super. 400, 45 A. (2d) 400, the facts are quite similar to those in the case now before us with the exception that the decedent was not a chemist and probably would not be as apt to discover that the poison was cyanide. The statute in Pennsylvania is also somewhat different with respect to the compensability of an accident arising out of the employment.

[4]See, Samsa v. Hanna Ore Min. Co. 172 Minn. 185, 214 N. W. 775; Hawkins v. Kronick Cleaning & Laundry Co. 157 Minn. 33, 195 N. W. 766, 36 A. L. R. 394; Sentieri v. Oliver Iron Min. Co. 201 Minn. 293, 276 N. W. 210; State ex rel. Oliver Iron Min. Co. v. District Court, 138 Minn. 138, 164 N. W. 582.

[5]See, for instance, Johnson v. Industrial Comm. 35 Ariz. 19, 274 P. 161; Chaudier v. Stearns & Culver Lbr. Co. 206 Mich. 433, 173 N. W. 198, 5 A. L. R. 1673.

However, with respect to the burden of proving suicide, the situations are the same. In that case a maintenance engineer had taken potassium cyanide and died from it shortly after. With respect to the proof of suicide, the court said (158 Pa. Super. 403, 45 A. [2d] 401):

"* * * if the facts proved permit of an inference of accidental death as well as an inference of suicide, the inference to be adopted is for the compensation authorities. Consequently, the findings of the compensation authorities based on such inferences must be sustained unless it appears that the inevitable conclusion from the facts presented was that the deceased committed suicide."

It is generally held that, when it is shown that an employee is found dead at a place where his duties required him to be or where he properly might have been in the performance of his duties during the hours of his work, in the absence of evidence that he was not engaged in his master's business, an inference is permissible that the death arose out of and in the course of the employment within the meaning of the compensation act.[6] In Henry v. D. A. Odell Motor Car Co. 191 Minn. 92, 96, 253 N. W. 110, 112, we said:

"* * * when an employe within his usual working hours is upon the streets of the city where the very nature of his work requires him to be and is operating an automobile furnished him by the employer with which to perform that work, then, in the absence of evidence as to whether the employe was there for personal reasons or whether he was there to serve his employer, there arises a presumption that he is acting in the course of his employment, which presumption sustains the burden of proof until satisfactory evidence to the contrary is produced."

In Chillstrom v. Trojan Seed Co. 242 Minn. 471, 478, 65 N. W. (2d) 888, 894, we said:

"* * * Where there is substantial evidence that the death of an employee resulted from an accident which occurred during his hours of work, at a place where his duties required him to be or where he might properly have been in the performance of his duties, the trier

---

[6]See, Annotation, 120 A. L. R. 683.

of fact may reasonably conclude as a natural inference that the accident arose out of and in the course of the employment."

The rule is stated in 58 Am. Jur., Workmen's Compensation, § 437, as follows:

"* * * it is generally held that when it is shown that an employee was found dead at a place where his duties required him to be, or where he might properly have been in the performance of his duties during the hours of his work, there is a presumption that the accident arose out of and in the course of the employment within the meaning of the compensation acts, in the absence of evidence that he was not engaged in his employer's business."

We think that this rule is in harmony with the liberal construction usually placed upon the Workmen's Compensation Act for the benefit of the employee.

Here, the only witness who knows what happened is dead, and the burden of the surviving dependent to establish exactly how the death occurred would be an almost insurmountable one if the trier of fact were not permitted to draw an inference from the facts that death occurred at a place where the employee was required to be in the performance of his duties, during his hours of employment, that the act arose out of the employment in the absence of evidence to the contrary. Inasmuch as we must hold that the evidence sustained a finding that the consumption of the poison was accidental, it is virtually certain, because of the nature of the poison, that it was consumed after the employee arrived at the laboratory. It therefore seems reasonable to conclude that the accident arose out of the employment. It at least seems more probable that this is what happened than that decedent was carrying this deadly poison on his person.

■ Employer assigns as error the allowance of interest on the award of accrued compensation. That question was decided adversely to relator in Brown v. City of Pipestone, 186 Minn. 540, 245 N. W. 145, and Bourdeaux v. Gilbert Motor Co. 220 Minn. 538, 20 N. W.

20

(2d) 393. The case of Lappinen v. Union Ore Co. 224 Minn. 395, 29 N. W. (2d) 8, clearly is distinguishable on the facts.
Affirmed.