# JUNE TERM, 1921.

SAVAGE v. CITY OF PONTIAC.

MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—FIREMEN
—EXPOSURE TO INCLEMENT WEATHER NOT AN "ACCIDENT."

The death of a city fireman as the result of exposure at a
fire in severe winter weather was not accidental within
the meaning of the workmen's compensation act, since the
exposure was incident to his employment and was not
different from that suffered by the other firemen at said
fire. WIEST and MOORE, JJ., dissenting.

Certiorari to Industrial Accident Board. Sub-
mitted April 8, 1921. (Docket No. 56.) Decided
July 19, 1921.

Amy Savage presented her claim for compensation
against the city of Pontiac for the accidental death of
her husband in defendant's employ. From an order
awarding compensation, defendant brings certiorari.
Reversed, and order vacated.

*Glenn C. Gillespie,* for appellant.

*Doty & Cram,* for appellee.

STONE, J. Applicant's deceased husband, Ray
Savage, for about 10 years prior to Saturday, January
31, 1920, had been employed as a fireman by the city
of Pontiac, during the last 2 years of which time he
had been a lieutenant. On the day aforesaid the

On compensation for injuries caused by weather conditions,
such as lightning, sunstroke, freezing, etc., as an accident
within the meaning of workmen's compensation acts, see notes
in L. R. A. 1916A, 38, 43, 241; L. R. A. 1917D, 108, 129; L.
R. A. 1918F, 936.

fire department was called out to fight a fire on Oakland avenue about 9 o'clock a. m. and he remained on duty until about 3:30 p. m. with the other firemen, during which time he had attended 2 fires, and then returned to the fire hall.  The deceased was an ablebodied man 32 years of age, and was in his usual condition when he went to work on the morning aforesaid.  It was a very cold day, and, as a result, while the firemen were fighting the fire, the water sprayed back on them, and when deceased returned to the fire hall his clothes were wet and frozen, and a layer of ice had frozen on his neck behind his right ear, and it was discovered that one of his ears had been frozen. The layer of ice which had formed on the back of his right ear and neck was an inch thick, and was frozen from under his cap down his neck, and his condition in that respect was worse than that of any of the other firemen.

Deceased changed his clothes and went home for supper, and while there complained of pains in his neck below the right ear.  He continued to work, however, until the following Wednesday, when he complained of being ill.  When he returned home on Wednesday night he went to bed and continued there until his death on February 21, 1920.  It appeared that at the fire deceased, with two other firemen, because of shortage of help, was compelled to handle 250 feet of hose, that was ordinarily handled by more men. A high wind was blowing which sent sprays of water over the firemen.  The following testimony was given:

"*Q.* How many men were on your line?
"*A.* Three.
"*Q.* How long a line did you have?
"*A.* About 250 feet of hose.
"*Q.* How many lines were working on this fire?
"*A.* Four or five.
"*Q.* State whether or not it is customary to have more than three men on a line?

"*A.* Usually more unless there is a lack of men.

"*Q.* At this fire, were there any more available men?

"*A.* No, sir."

There was no accident happened at either of the fires, and deceased suffered no exposure which was not suffered by the other firemen, and which was an incident to his employment. The following was in testimony:

"*Q.* There was nothing unusual about getting your clothing wet at a fire?

"*A.* Nothing, only this fire got the better of us and it took longer to get it under control."

During his illness deceased was treated by several physicians, among whom was Dr. J. J. Murphy, a practicing physician of 23 years' experience. He attended deceased several times, and after his death signed the death certificate, giving pneumonia-meningitis as the cause of death. Dr. Bernard TePoorten— a doctor of chiropractic—who attended deceased, testified that death was the result of the formation of ice at the back of deceased's neck which caused a contraction of the muscles, displacing the axis and atlas vertebræ, which produced pressure on the spinal cord, resulting in paralysis and death. Dr. TePoorten testified:

"*Q.* What did the examination disclose?

"*A.* That the axis and atlas vertebræ were displaced.

"*Q.* What was the result of this displacement?

"*A.* They were pressing on the spinal cord.

"*Q.* What would produce that condition?

"*A.* Any contraction of the muscles that control these vertebræ.

"*Q.* Would ice on the back of the neck cause it?

"*A.* Yes, a formation of ice on the back of the neck could bring it about.

"*Q.* Was any part of his body paralyzed?

"*A.* Yes, his throat and right side.

"*Q.* What was the cause of this?

"*A.* The displacement of the vertebræ.

"*Q.* What was the condition of his throat?

"*A.* Paralyzed, so that he could not swallow.    *
*    *

"*Q.* What did the conditions finally develop into?

"*A.* A paralysis of the body.    *    *    *

"*Q.* In your opinion from your examination, what was the cause of the death of Mr. Savage?

"*A.* Paralysis caused by nerve pressure."

This theory seems to have been the one adopted by the industrial accident board in its finding.

It is the claim of defendant city that no accident or accidental injury, within the meaning of the workmen's compensation act, occurred in this case, and that the wetting and exposure received by deceased at the fires was an incident which, from the very nature of the employment, every fireman is subjected to in Michigan, during the severe winter weather; and that the instant case is governed and ruled by the case of *Landers* v. *City of Muskegon,* 196 Mich. 750 (L. R. A. 1918A, 218). There was an award by the committee on arbitration in favor of the applicant for full compensation for the death of decedent, and this award was affirmed by the industrial accident board, and the city has brought the record to this court by writ of certiorari for review.

The board in its finding sought to distinguish the instant case from the *Landers Case,* and among other things said:

"The case at bar differs in several particulars from the *Landers Case,* and is easily distinguishable from it. The evidence in this case shows that the day in question was a bitter cold day, and all the firemen who testified were unanimous in testifying that the exposure was the worst in their experience. The testimony also shows that the deceased was forced to fight two fires practically simultaneously, without an opportunity to change, or dry his clothing (as the

firemen always did after each fire). The record reveals that at the second fire, two houses were burning instead of one, and that as a result of the conditions, the fire got beyond the control of the department. This was due to shortage of men, broken hose, and frozen chemical apparatus. The testimony shows that the deceased and two other men were compelled to handle 250 feet of hose, that was ordinarily handled by more men; because of the shortage of help. It also shows that there was a high wind blowing which sent sprays of water upon the firemen. As result of working under these disadvantageous conditions, the deceased suffered a frozen ear, and a thick layer of ice formed on his neck behind the right ear. In view of the foregoing circumstances, it is urged by the claimants that the unusual occurred and assert their position borne out by the testimony of the chief of the fire department, who testified that if firemen anticipated working under such conditions, it would be impossible to employ them. * * * The weight of the evidence clearly shows that the formation of ice on the back of decedent's neck, behind the right ear, so affected his system that paralysis resulted and that he died as a result of the paralysis. * * * The authorities seem quite agreed that frost bite and freezing are compensatable injuries, where the injured workman is subjected to unusual exposure. The trend of the decisions is that where an injured workman is subjected to no more exposure than the average person in the same community, he is not entitled to compensation for frost bites or freezing. On the other hand, the decisions are practically unanimous that an injured workman is entitled to compensation for frost bites or freezing where he is subjected to more extreme exposure than the average person in the same community."

The board cites the following cases:

*Larke* v. *Insurance Co.,* 90 Conn. 303 (97 Atl. 320, L. R. A. 1916E, 584); *McManaman's Case,* 224 Mass. 554 (113 N. E. 287); *Skougstad* v. *Star Coal Co.,* Fourth Annual Report (1915), Wis. Ind. Com. 31; 12 N. C. C. A. 309.

The board concludes its finding as follows:

"It is the opinion of the board that the injury re-
sulting from the formation of the ice on the back of
decedent's neck, under the circumstances of this case,
constituted a compensatable accident within the mean-
ing of the workmen's compensation law. It was an
unexpected consequence from the continued work un-
der extreme exposure while working at a disad-
vantage, and while exerting himself to an unusual
degree. *La Veck* v. *Parke, Davis & Co.*, 190 Mich.
604 (L. R. A. 1916D, 1277) ; *Bayne* v. *Storage & Cart-
age Co.*, 181 Mich. 378.

"In the opinion of the board, the formation of the
layer of ice on the back of decedent's neck was an un-
toward and unusual event. *Roach* v. *Kelsey Wheel
Co.*, 200 Mich. 299.

"We must therefore find that the decedent sustained
an accidental personal injury within the meaning of
the act, and it therefore follows that the award of
the committee on arbitration must be sustained."

In fairness to the board we have here quoted at
length from the finding.

It is the claim of the appellant that while many
decisions can be found in the several States allow-
ing compensation for injuries which occur to em-
ployees through manifestations of the laws of nature,
an examination of the various compensation acts will
show that compensation is paid in some States where
the injury is received and "arises out of the course
of the employment," while in others, of which Mich-
igan in one, the injury must be an "accidental" one.

In Bradbury's Workmen's Compensation (3d Ed.),
p. 317, the author says:

"Some of the compensation acts provide for com-
pensation when a workingman receives an 'injury' in
the course of his employment, while others specify an
'accidental injury' or an 'injury by accident,' as the
foundation for such claim. As interpreted by the
courts, accident boards, industrial commissions and

Federal authorities, the distinction seems to be an important one."

In 1 Honnold on Workmen's Compensation, pp. 274-278, it is said:

"A comparison of the various American compensation acts, discloses that some do not make 'accident' a condition to the right to recover compensation, while others, following the English act, describe not only that there shall be a personal injury, but that it shall be by accident.  The word 'accident' refers to the cause of the injury, and is here used in its ordinary and popular sense as denoting an unlooked for mishap, or an untoward event which is not expected or designed by the workman himself, a physiological injury as a result of the work he is engaged in, an unusual effect of a known cause, a casualty.  It implies that there was an external act or occurrence which caused the injury or death.  It contemplates an event not within one's foresight and expectation resulting in a mishap causing injury to the employee."

The only distinction we are able to make between the instant case and the *Landers Case* is one of degree.  The principle appears to be the same.  The day was colder and the exposure was longer in the instant case than in the *Landers Case,* but there seems to have been no accident, or accidental injury in either.  In its decision we believe that the board overlooked the distinction which is made between those acts providing for compensation for "accidental injuries," such as our own, and those acts which provide compensation for injuries which "arise out of the course of the employment," only.  It will be found that nearly all of the cases cited by the board are collected in Bradbury (p. 644) under the title "Frostbite" as "injuries arising out of" and "in course of employment."

An examination of the acts of the several jurisdictions discloses that the Wisconsin statute provides

compensation "for personal injuries sustained within this State by an employee while engaged in the line of his duty as such, or for death resulting from personal injury so sustained."

The Massachusetts act covers "all damage for personal injury sustained by an employee in the course of his employment, or for death resulting from personal injury so sustained."

We have already recognized the distinction that exists in the decisions of the several States, owing to the different provisions of the several acts, and recently said of cases cited under the Massachusetts act:

"As 'accident' is the controlling word in our act, we do not think that the Massachusetts decision should be held to apply here, as the construction of that act has little, if any, bearing on the Michigan act." *Adams* v. *Acme White Lead, etc., Works,* 182 Mich. 157, 169 (L. R. A. 1916A, 283, Ann. Cas. 1916D, 689).

And the same may properly be said of the Connecticut and Wisconsin acts. This is conceded by counsel for applicant, who say in their brief:

"We quite agree with the attorney for the appellant, that the cases in Massachusetts, Wisconsin and Connecticut are not decisive on the question in the case at bar, because 'accident' is not the controlling word of the statute in those States."

We have been unable to find a case under any statute similar to our own, providing for compensation for "accidental injuries," where compensation has been awarded an employee for an injury received in the course of his employment, through purely natural causes, where the employee was no more subject to the injury than others similarly employed. There are many English decisions to the effect that compensation under such circumstances will not be allowed, and the

English act is very similar to our own. See *Adams Case*, at page 166.

We cite the following recent cases in this court upon the subject of accidental injury: *Roach* v. *Kelsey Wheel Co., supra; Tackles* v. *Bryant & Detwiler Co.,* 200 Mich. 350; *Guthrie* v. *Detroit Shipbuilding Co.,* 200 Mich. 355. The above cases and the cases therein cited show the construction which our statute has received.

We have examined the cases in other jurisdictions cited by counsel for applicant. The Minnesota cases cannot be considered as authority in this State, because of the statutory definition there of the word "accident." Counsel for applicant well say:

"It might be well in passing to note that the word 'accident' is defined by statute in Minnesota, and that in addition to including in the definition the elements of making up that term as defined by our court in *Adams* v. *Acme White Lead, etc., Works,* 182 Mich. 157, it includes: 'Happening suddenly and violently.'"

In the *Adams Case* we adopted the language in *Fenton* v. *Thorley & Co.,* 72 L. J. K. B. 790:

"The expression 'accident' is used in the popular and ordinary sense of the word as denoting an unlooked for mishap or an untoward event which is not expected or designed."

Being unable upon principle to distinguish the instant case from that of *Landers* v. *City of Muskegon,* and being of opinion that that case was properly decided, the award made by the industrial accident board is reversed and set aside.

Steere, C. J., and Fellows, Clark, Bird, and Sharpe, JJ., concurred with Stone, J.

Wiest, J. (*dissenting*). I cannot agree with the conclusion reached by Mr. Justice Stone in this case. If it can be said that the fastening of the ice upon

the neck and the consequent injury to the spine was no more than an incident likely to happen to a fireman in severely cold weather, while pursuing his employment, then I am ready to concede that it was no accident within the meaning of our compensation act. The injury to the spine was occasioned by a most extraordinary mishap. We may accept the postulate that, in the eye of the law, there is no accident in the absence of violence, casualty or *vis major* and yet bring this case within the rule.

There is evidence supporting the finding that the ice fastened to the neck of the deceased caused a hurt to his spine and thereby occasioned his death. If the deceased had hurt his spine in exerting himself at the fire it would have been an accident. The ice upon his neck exercised external violence and injured his spine and caused his death, according to the opinion of one medical witness. This traumatic violence takes the case out of the holdings cited by my Brother.

I am of the opinion that, under the evidence, the board properly determined that the deceased met with an accident within the meaning of our law, and the award should be affirmed.

MOORE, J., concurred with WIEST, J.