# HARRIET E. BREIMHORST v. WILLIAM BECKMAN AND ANOTHER. JOHN G. ANDRIST, APPELLANT.[1]

January 14, 1949.

Nos. 34,723, 34,727.

[1]Reported in 35 N. W. (2d) 719.

*Streissguth & Berens,* for appellant Harriet E. Breimhorst.
*Gallagher, Farrish & Sheran,* for appellant John G. Andrist.
*Moonan, Sturner, Heinen & Lindmeyer,* for William Beckman, respondent.

MATSON, JUSTICE.

In a common-law action for damages for disfigurement, we have an appeal by defendant John G. Andrist from an order denying his blended motion for judgment *non obstante* or a new trial, and an appeal by plaintiff, Harriet E. Breimhorst, from an order denying

her motion for a new trial as to defendant William Beckman.

At Jordan, Minnesota, on the morning of December 15, 1946, plaintiff, a part-time waitress, in the course of her employment, was injured in a restaurant operated by defendant Andrist on premises rented by him from defendant Beckman. The restaurant occupied a rectangular room about 25 feet long from west to east and about 15 feet from north to south. A service bar about 18 feet long was located approximately in the middle of the room parallel to the north and south walls. Placed against the north wall and standing end to end were two cabinets or back bars. The shorter of these back bars was 7 feet long and extended from a point about 16½ inches from the front or west wall of the restaurant. The larger or rear back bar was 9 feet 4 inches long by 19½ inches wide, and its west end was separated from the first back bar by a distance of only 6¾ inches. Between the two back bars so placed against the north wall and the service counter or bar was a 25-inch aisle for use by waitresses and bartenders. The larger or rear back bar, with which we are here primarily concerned, served as a cabinet for the storage of linen and other supplies. It was divided vertically into four separate compartments equipped with sliding doors and divided horizontally into three shelves. The top inside shelf was located about 27 inches from the floor. The top of the bar itself was 34¼ inches above the floor. On the top inside shelf, behind the second sliding door from the east end, the daily supply of restaurant towels was stored. Plaintiff, in making preparations for the commencement of the day's business, went to this compartment for a towel. As she reached for the towel, she saw a white string lying on top of the towel bundle. In the belief that this string bound the towels together, she gave it a jerk and unwittingly tripped a burglar-alarm device—made in the form of a spring gun mounted inside the towel compartment—which discharged into her face a 12-gauge shotgun shell containing powder but no shot. The exploding shell burned her face, neck, upper chest, and arms and caused flecks of powder to be embedded in her skin and eyes. She was taken to the Shakopee hospital and given medical treatment. Her employer, defendant

Andrist, and his employes were covered by the workmen's compensation act. Although plaintiff never petitioned the industrial commission for an award of compensation, she did receive and accept disability, hospital, and medical benefits, and for these payments she regularly signed receipts, inclusive of a final receipt filed with the industrial commission. From the time of her injury on December 15, 1946, until about the middle of the following January, she was unable to perform her work. In February she again received surgical treatment. *Aside from any handicap resulting from her disfigurement,* plaintiff has fully recovered and is employable once more. On the theory that she has no remedy under the workmen's compensation act for the recovery of damages for permanent disfigurement, on the assumption that such disfigurement does not materially impair her employability, plaintiff brought this action at law for damages against her employer, Andrist, and also against Beckman as owner of the building. Plaintiff tendered repayment of the amount she had received as workmen's compensation benefits. The motion of Beckman, the landlord, for a directed verdict was granted. Andrist, the employer, asserting that plaintiff's sole remedy is under the workmen's compensation act, also moved for a directed verdict, which motion was denied on the ground that plaintiff's injuries *did not arise out of her employment,* in that they were the result of an unlawful or criminal act—wholly foreign to the agreement of employment—knowingly committed by her employer. Plaintiff was awarded a verdict of $3,577.80. In addition to the question of the landlord's liability for a concealed danger and for a nuisance, we have, with respect to defendant employer, the following issues:

(1) Did plaintiff's injuries arise out of her employment?

(2) If employer could foresee that the gun was a source of danger, was there an "accident" under M. S. A. 176.01, subd. 9?

(3) Does the fact that the spring gun was an illegal device prevent plaintiff's injuries from "arising out of" the employment?

(4) Did employer intentionally and maliciously assault his em-

ploye with the spring gun so as to give plaintiff the option of proceeding by a common-law action for damages?

(5) Is plaintiff's remedy under the workmen's compensation act exclusive?

(6) Is the compensation act unconstitutional as constituting an encroachment upon the powers of the judiciary and as depriving plaintiff of (a) the right to trial by jury, and of (b) an adequate remedy?

A proper determination of the issues herein requires a more detailed description of the spring gun, its installation, and history. It consisted of a tube six inches long and one inch in diameter which was constructed so that the upper half could be unscrewed from the bottom half for the purpose of inserting a tear-gas or a powder shell. The bottom of the tube was equipped with a spring which when released by the tripping of a side-arm lever would drive a firing pin forward to detonate the shell. The mechanism was mounted on a wood base screwed to the inside back wall of the towel compartment, with the firing tube about three inches below the cabinet ceiling and pointing directly from the back wall toward the opening of the towel compartment.

The device was originally installed in the back bar in 1938 as a tear-gas burglar alarm for Mr. and Mrs. Charles Lagerstrom, who then occupied, and operated a restaurant on, the premises. Attached to the firing tube were two trip lines or strings. These led from the back bar to the various windows and doors in such a manner that if a window or door were opened the tension placed upon either line would trip the tube mechanism and discharge the tear-gas shell. Also attached to the spring gun were two electric wires. These ran from the device on the inside of the rear back bar out and across the 6¾-inch opening between the ends of the two bars, then followed the back side of the west back bar, and from thence ran to the north wall and around to the front wall, where they connected with a small electric bell mounted on the outside of the building near the front door. The spring-gun mechanism was so designed that the discharge of the tear-gas shell would produce an electric contact and

cause the bell to ring. Shortly after installation of the device a tear-gas shell was accidentally discharged. Because of the difficulty of clearing the premises of gas on this occasion, the Lagerstroms, instead of reloading the device with a tear-gas cartridge, inserted a shotgun shell from which the shot but not the powder had been removed. The Lagerstroms operated the restaurant until 1942.

We shall assume that the lessor, subsequent to the installation of the spring gun, made a new and independent demise of the premises to one of the succeeding tenants, although the record is not satisfactory on this point. Prior to April 9, 1946, H. W. Schulte occupied the premises and operated the restaurant. On this last-mentioned date, about eight months before plaintiff was injured, Andrist purchased the business, equipment, and the trade fixtures from Schulte. Upon the uncontradicted testimony of Andrist, it appears that the back bars constituted a part of the fixtures so purchased. It should be noted that the back bars were not attached to the building except by the two electric wires hereinbefore described.

At the time of the accident the electric wires were intact. Attached to the trip lever were two short strings, apparently remnants of the original trip lines. One of these strings was black—about the size of a 20-pound silk fish line—and extended from the lever to the west end of the rear back bar so as to leave exposed a broken end of about two inches. The loose broken end had been painted white. The other string was white, and the free end was lying loose on top of the towel bundle. Two wire staples were tacked to the ceiling of the compartment about three inches apart and about six inches from the spring gun, through which the white string may originally have passed.

What knowledge of this spring gun was possessed by the parties? Clearly, plaintiff, who had worked on the premises on a part-time basis only since sometime in October, had no knowledge of its existence. There is no testimony that Beckman, who owned the building, ever knew of the spring gun, its installation, or of its conversion from a tear-gas device to that of a mechanism for discharging shot-

gun shells. Over a period of many years, he had visited the cafe several times a week. In 1942 or 1943 he personally painted the inside walls. In June 1946, he installed a new awning, at which time he saw the alarm bell on the outside wall. He had also seen the two electric wires where they passed over a window frame on the inside of the cafe. Beckman further testified that he did not know of the sale of the restaurant business by Schulte to Andrist until he received and accepted rent from Andrist.

Andrist, who on April 9, 1946, bought the business and fixtures, including the back bars, from Schulte, disclaimed any and all knowledge of the spring gun and its installation. During the eight-month period of his occupancy, he had been on the premises from 10 to 12 hours a day. He had used the back bar cabinets regularly for the storage of linens and other supplies.

### LIABILITY OF LANDLORD FOR CONCEALED DANGERS

Beckman's liability as lessor to plaintiff as an employe of his lessee (Andrist) for injuries caused by any defective condition of the leased premises is determined by the same rules which would govern his liability to the lessee had the latter been injured under the same circumstances. In this respect, the servant of the lessee stands in the same position as do his invitees and guests. Keegan v. G. Heileman Brg. Co. 129 Minn. 496, 152 N. W. 877, and cases there cited; Annotations: L. R. A. 1916F, 1140, 110 A. L. R. 756, 34 L. R. A. 609, and 17 L.R.A. (N.S.) 1161; 32 Am. Jur., Landlord and Tenant, §§ 665, 671; 26 Mich. L. Rev. 383, 410. In the absence of a warranty by the landlord of the present or future state of repair of the premises, the general rule is that the lessor is not liable in tort to the lessee, or to his invitees, for any dangerous conditions or defects in the premises, but to this general rule there is this exception:

"A lessor of land, who conceals or fails to disclose to his lessee any natural or artificial condition involving unreasonable risk of bodily harm to persons upon the land, is subject to liability for such harm caused thereby to the lessee and others on the land with the

consent of the lessee or a sublessee after the lessee has taken possession, if

"(a) the lessee does not know of the condition or the risk involved therein, and

"(b) the lessor knows of the condition and realizes the risk involved therein and has reason to believe that the lessee will not discover the condition or realize the risk." Restatement, Torts, § 358.[2]

In the application of the above rule, the liability of the lessor to the lessee in this jurisdiction—contrary to the minority view expressed under Restatement, Torts, § 358(b), *comment a*—is not restricted to those instances where the lessor has actual knowledge of the dangerous condition of the premises, but includes those cases where he has information which would lead an ordinarily reasonable man to suspect that danger exists.[3] It is to be noted that:

"The liability of the lessor is not based upon his failure to exercise reasonable care to keep the land in safe condition but upon his concealment or failure to disclose conditions which he realizes are likely to cause bodily harm to the lessee or others whom the lessee, in ignorance of the danger, invites or permits to enter the land. It is, therefore, immaterial whether the condition which, to the knowledge of the lessor, threatens danger, is artificial or natural." Restatement, Torts, § 358, *comment c*.

---

[2]The Minnesota decisions are substantially in accord. Keegan v. G. Heileman Brg. Co. 129 Minn. 496, 152 N. W. 877, L. R. A. 1916F, 1149; Ames v. Brandvold, 119 Minn. 521, 138 N. W. 786; Daley v. Towne, 127 Minn. 231, 149 N. W. 368; Murphy v. Barlow Realty Co. 214 Minn. 64, 7 N. W. (2d) 684; Mani v. E. Hugo Erickson, Inc. 209 Minn. 65, 295 N. W. 506. See, 4 Shearman and Redfield (Rev. ed.) Negligence, § 784.

[3]Murphy v. Barlow Realty Co. 214 Minn. 64, 7 N. W. (2d) 684; see, Anderson v. Winkle, 213 Minn. 77, 5 N. W. (2d) 355; Prosser, Torts, § 81, p. 651; 26 Mich. L. Rev. 260, 268 (1928); 11 Cornell L. Q. 253; 4 Dunnell, Dig. & Supp. § 5369; 1 Tiffany, Landlord and Tenant, § 96, pp. 651-652.

The liability for concealing or failing to disclose a dangerous condition unknown to the lessee is based on the theory of negligence.[4]

In the light of these rules governing the liability of the lessor with respect to concealed traps or dangerous conditions which are known to him and not known to the lessee, the trial court was not in error in directing a verdict for Beckman or in denying plaintiff's motion for a new trial. There is no evidence that Beckman had any actual knowledge of the existence of the spring gun as an instrumentality for the discharge of a dangerous explosive or shell. Clearly, negligence in failing to disclose a dangerous condition cannot be predicated on lessor's actual knowledge. Furthermore, the evidence does not disclose facts or circumstances from which a jury could justifiably find that the lessor ought reasonably to have suspected that a dangerous condition existed. If, contrary to what the record shows, we assume *(in the light of plaintiff's motion for a new trial on the ground of newly discovered evidence)* that the defendant Beckman knew of the accidental discharge of tear gas shortly after the device was installed, such knowledge only served to put him on notice that his tenant had equipped the premises with a tear-gas mechanism which, if used for the purpose for which it was intended, might inflict temporary discomfort but not bodily harm. There is no evidence that he knew that the device had been, or that it could be, diverted to the purpose of discharging a shotgun shell. The only demonstration of how the burglar-alarm mechanism operated was with tear gas, which would reasonably lead the lessor to believe that its functional use was confined to that element. Although lessor had painted the inside walls and made certain other repairs such as installing a new awning, we find nothing of substance which should have put him on notice. He had observed the electric wires and the outside alarm bell, but this did not reasonably indicate they were connected with a spring gun for discharging shotgun shells instead of tear gas. The spring gun itself was mounted inside a trade

[4]Keegan v. G. Heileman Brg. Co. 129 Minn. 496, 152 N. W. 877, L. R. A. 1916F, 1149; see, Mich. L. Rev. 275; 84 U. of Pa. L. Rev. 467; 1 Tiffany, Landlord and Tenant, § 86, p. 565.

fixture, over which he had no control and which had passed by sale from one tenant to another. Even if we assume, as plaintiff contends, without so deciding, that the spring gun and the connecting wires and the alarm bell constituted a single instrumentality which were as much a part of the building as of the trade fixtures, we see no basis for a finding that lessor ought reasonably to have known or suspected a concealed danger. In any event, the source of danger was mounted inside a cabinet which at all times had been under the control of the lessee or his predecessors in interest.

Obviously, the instant case, wherein plaintiff is an employe of the lessee, does not fall within the public-use exception that a lessor, by leasing the premises for a purpose involving the admission of the public, may incur liability to a patron of the lessee who has sustained injury by reason of a dangerous artificial condition existing on the premises at the time they were leased. Bailey v. Kelly, 93 Kan. 723, 145 P. 556, L. R. A. 1916D, 1220; Restatement, Torts, § 359, *comments a, b, c;* 84 U. of Pa. L. Rev. 467, 477; 26 Mich. L. Rev. 285-289; Annotations, 123 A. L. R. 870 and L. R. A. 1916F, 1142; Prosser, Torts, § 81, p. 653; 1 Tiffany, Landlord and Tenant, § 96, p. 655.

### LIABILITY OF THE LANDLORD FOR A NUISANCE

We are not here concerned with the theory of nuisance. The rule of liability of a landlord leasing premises in a dangerous condition amounting to a nuisance, which exists in favor of third persons or strangers, does not apply as between landlord and tenant and does not entitle the tenant, his servants, guests, or others entering under his title to recover. Fraser v. Kruger (8 Cir.) 298 F. 693; Harris v. Lewistown Trust Co. 326 Pa. 145, 191 A. 34, 110 A. L. R. 749, with Annotation at 756; Jackson v. Public Service Co. 86 N. H. 81, 163 A. 504. This distinction between the liability of the landlord to third persons and his liability to a tenant, and those entering under the tenant's title, has been recognized by this court. Ames v. Brandvold, 119 Minn. 521, 138 N. W. 786; Harpel v. Fall, 63 Minn. 520, 523-524, 65 N. W. 913, 914. Phraseology with implica-

tions to the contrary in Keegan v. G. Heileman Brg. Co. 129 Minn. 496, 500, 152 N. W. 877, 878, L. R. A. 1916F, 1149 (and in subsequent decisions based thereon), was unnecessary to the decision and is dicta.[5]

## INJURY AROSE OUT OF EMPLOYMENT

■ Defendant Andrist contends the trial court was without jurisdiction, on the theory that plaintiff's exclusive remedy is under the workmen's compensation act. It is admitted that plaintiff's injury was sustained in the course of the employment. Did her injury, however, result from an "accident" arising out of her employment as required by M. S. A. 176.02? In Olson v. Trinity Lodge, 226 Minn. 141, 144, 32 N. W. (2d) 255, 257, we held:

"The phrase 'arising out of' the employment expresses the factor of origin, source, or contribution rather than cause in the sense of being proximate or direct. * * * The standard of origin or source as a contributing factor obviously goes far beyond the restrictive limitations of the tort concept of proximate cause. * * *

" '* * * An injury arises out of the employment if it arises out of the nature, conditions, obligations or incidents of the employment; in other words, out of the employment looked at in any of its aspects.' "

Confusion frequently arises from the varying implications of the phrase "peculiar to the work and not common to the neighborhood." Novack v. Montgomery Ward & Co. 158 Minn. 495, 499, 198 N. W. 290, 292. It is not primarily a question of whether the hazard is peculiar to the employment, but whether the employment is the predominant factor in peculiarly exposing the workman—in a different manner and in a greater degree than if he had been pursuing his ordinary personal affairs—to a hazard which may or may not be peculiar to or exclusively associated with the employment, and which hazard,

[5]For discussion of basis of nonliability of landlord to tenant for nuisance, see Fraser v. Kruger (8 Cir.) 298 F. 693; 1 Tiffany, Landlord and Tenant, § 101; Restatement, Torts, c. 40, Scope and Introductory Note, preceding § 822; Prosser, Torts, pp. 549, 553, 566, 652.

though part of the general working environment, may be in direct consequence of an injury-producing act or event produced wholly within or *without* the orbit of work done for the employer by the claimant or others.[6]

In the instant case, the employment clearly was the sole factor in exposing plaintiff to the blast of the shotgun shell when she accidentally tripped the firing mechanism in reaching for a towel. As a burglar-alarm device originally installed for the protection of the premises, the spring gun was part and parcel of the working environment. The conditions of plaintiff's employment were the source of her injuries, and as such they arose out of her employment.

### Accident—Unexpected by Employe

■ The trial court held, however, that plaintiff was not involved in an *accident* as defined in the workmen's compensation act, first, on the theory that defendant Andrist had, or must have had, knowledge of the existence of the spring gun and that he could therefore foresee that plaintiff might be injured. The trial court was in error. M. S. A. 176.01, subd. 9, provides:

"The word 'accident,' as used in the phrases 'personal injuries

---

[6]State ex rel. Rau v. District Court, 138 Minn. 250, 164 N. W. 916, L. R. A. 1918F, 918 (sunstroke); Novack v. Montgomery Ward & Co. 158 Minn. 495, 198 N. W. 290 (injured on way to work by reason of unguarded elevator on defendant's premises); Hanson v. Robitshek-Schneider Co. 209 Minn. 596, 297 N. W. 19 (salesman fatally assaulted in crime-infested area of city); Fisher v. Fisher, 226 Minn. 171, 32 N. W. (2d) 424 (salesman waiting for customer at ball game injured by flying glass where ground was usually littered with broken glass); Auman v. Breckenridge Tel. Co. 188 Minn. 256, 246 N. W. 889 (injuries from stray bullet held not to arise out of employment); Ohlsen v. J. G. Dill Co. 222 Minn. 10, 23 N. W. (2d) 15 (employe drowned while entertaining employer's customers on fishing trip); Kimbol v. Industrial Acc. Comm. 173 Cal. 351, 160 P. 150, L. R. A. 1917B, 595, Ann Cas. 1917E, 312 (injury from collapse of overhead floor controlled by third party); Marchiatello v. Lynch Realty Co. 94 Conn. 260, 108 A. 799 (workman fatally injured by bullet fired by boy who had access to pistol kept on employer's premises); see, Olson v. Trinity Lodge, 226 Minn. 141, 32 N. W. (2d) 255; Prosser, Torts, § 69, pp. 534 to 539; 8 Wis. L. Rev. 217; Hartford Acc. & Ind. Co. v. Cardillo, 72 App. D. C. 52, 112 F. (2d) 11.

due to accident' or 'injuries or death caused by accident,' means an *unexpected or unforeseen event*, happening suddenly and violently, with or without human fault, and producing at the time injury to the physical structure of the body, * * *." (Italics supplied.)

In keeping with the spirit and purpose of the workmen's compensation act, it is clear that the element of being "unexpected or unforeseen" has reference to the mental state of the employe and not of the employer. To be an "accident" within the meaning of § 176.01, subd. 9, the event causing the injury need only be "unexpected or unforeseen" by the employe who sustains the injury. Other jurisdictions are in accord.[7] What Andrist could foresee or not foresee is immaterial. Illustrative of the inapplicability to the employer of the limitation that the injury-producing event must not be expected or foreseen is our holding that an employe who has sustained disability injuries in his employment from the intentional and malicious assault of the employer may recover compensation under the act, or, at his election, may proceed against the employer in a common-law action. Boek v. Wong Hing, 180 Minn. 470, 231 N. W. 233, 72 A. L. R. 108.[8, 9]

[7]John H. Kaiser Lbr. Co. v. Industrial Comm. 181 Wis. 513, 195 N. W. 329; Savage v. City of Pontiac, 214 Mich. 626, 183 N. W. 798; Grola v. Industrial Comm. 388 Ill. 114, 57 N. E. (2d) 373; Hagger v. Wortz Biscuit Co. 210 Ark. 318, 196 S. W. (2d) 1; Oklahoma-Arkansas Tel. Co. v. Fries, 128 Okl. 295, 262 P. 1062; see, Richards v. Travelers Ins. Co. 89 Cal. 170, 26 P. 762, 23 A. S. R. 455; Trim Joint District School v. Kelly (1914) 7 B. W. C. C. 274, H. L., approving (1913) 6 B. W. C. C. 921, C. A.; 1 Honnold, Workmen's Compensation, § 85; 71 C. J., Workmen's Compensation Acts, § 328; 1 Schneider, Workmen's Compensation Law (2 ed.) § 135, p. 513; Knowles, Law Relating to Workmen's Compensation (4 ed.) 12, 13.

[8]Distinguish from principle governing ordinary injury-producing event which may be foreseeable. Foreseeability or unforeseeability in this sense has reference to the distinction between risks which ordinarily occur in a certain type of employment and those which do not ordinarily occur therein, such as death by lightning. See, State ex rel. Peoples C. & I. Co. v. District Court, 129 Minn. 502, 153 N. W. 119, L. R. A. 1916A, 344; Horovitz, Current Trends in Workmen's Compensation, 513; Hartford Acc. & Ind. Co. v. Cardillo, 72 App. D. C. 52, 54, 56, 112 F. (2d) 11, 13, 15.

[9]As to compensable and noncompensable injuries resulting from the in-

## Maintenance of Spring Gun in Violation of Statute

■ The trial court also held the injury did not arise out of the employment, on the ground that the maintenance of a spring gun on the premises in violation of M. S. A. 616.44 (which imposes a fine or imprisonment for the setting of a spring gun) was an illegal act, and that it was not within the contemplation of the parties that the contract of employment would require the plaintiff to work in the proximity of an instrumentality maintained in violation of a criminal statute. For our purposes here, we shall assume that the moment the spring gun was diverted from its original purpose by being loaded with a shotgun shell it became a deadly weapon in violation of the aforesaid statute. Andrist had no part in the setting of the spring gun or in loading it with a shotgun shell. The statute does not make it a crime to have a spring gun on the premises without knowledge of its existence. The evidence does not support a finding of the necessary knowledge required to sustain a criminal intent. Insofar as it was a crime to have the device on the premises, it must be treated as the criminal act of a third party and not of Andrist. The presence of the spring gun on the premises, as already noted, was part and parcel of plaintiff's immediate working environment. The fact that an injury by accident is caused by an act which is criminal or illegal does not of itself prevent it from arising out of the employment. In Corcoran v. Teamsters & Chauffeurs Joint Council, 209 Minn. 289, 297 N. W. 4, and Hanson v. Robitshek-Schneider Co. 209 Minn. 596, 297 N. W. 19, the injuries were held to arise out of the employment although they were inflicted by the criminal acts of third parties. In Novack v. Montgomery Ward & Co. 158 Minn. 495, 503, 198 N. W. 290, 294, although the injury was caused by an elevator operated in an unguarded condition in violation of law, the injury was held to arise out of the employment.[10]

tentional acts of third parties, see Hanson v. Robitshek-Schneider Co. 209 Minn. 596, 297 N. W. 19; Hartford Acc. & Ind. Co. v. Cardillo, 72 App. D. C. 52, 112 F. (2d) 11; Annotation, 72 A. L. R. 110.

[10] Honnold, Workmen's Compensation, § 87; Annotation, 72 A. L. R. 114, 117.

### Necessity of Deliberate Intent—Assault

■ Plaintiff, however, contends that, although she may have a remedy under the workmen's compensation act, she is not limited to a recovery thereunder, but may elect to seek relief at common law on the ground that Andrist intentionally and maliciously assaulted her through the discharge of an illegal spring gun, under the rule that when an employer *intentionally and maliciously* inflicts injury upon his employe the injured employe may elect either to sue at common law or to accept the benefits of the workmen's compensation act.[11] See, Boek v. Wong Hing, 180 Minn. 470, 471, 231 N. W. 233, 234, 72 A. L. R. 108. Again assuming the device constituted a spring gun or other deadly weapon within § 616.44, were plaintiff's injuries the result of a felonious or wilful assault by defendant Andrist? The discharge of the device cannot constitute an assault and battery upon plaintiff unless the requisite malicious or deliberate intent to effect an assault can be shown. Under the rule of the Boek v. Wong Hing case, an assault must be both intentional and malicious. The term "malicious" in its meaning involves ill will of a degree that is the equivalent of a deliberate intent to injure others. The word "wilfully," also used in said decision, is of like import. See, Funk & Wagnalls New Standard Dictionary (1945). Andrist may have been negligent in not discovering the spring gun with its lethal charge, but such negligence is not tantamount to a malicious or deliberate intent to assault plaintiff or any other person. Properly speaking, there is no such thing as a negligent assault.[12] Clearly, the circumstances herein do not warrant a find-

[11]DeCoigne v. Ludlum Steel Co. 251 App. Div. 662, 297 N. Y. S. 636; Le Pochat v. Pendleton, 187 Misc. 296, 63 N. Y. S. (2d) 313; Rumbolo v. Erb, 19 N. J. Misc. 311, 20 A. (2d) 54; Castleberry v. Frost-Johnson Lbr. Co. (Tex. Com. App.) 283 S. W. 141, affirming (Tex. Civ. App.) 268 S. W. 771; 6 Dunnell, Dig. & Supp. §§ 10425, 10385, 10396; Horovitz, Injury and Death Under Workmen's Compensation Laws, 336; 1 Schneider, Workmen's Compensation Law (2 ed.) § 287, p. 928; but see, Stewart v. McLellan's Stores Co. 194 S. C. 50, 9 S. E. (2d) 35.

[12]Prosser, Torts, § 10, p. 52; Restatement, Torts, § 13, *comment d;* White v. Sander, 168 Mass. 296, 47 N. E. 90.

ing that Andrist must have known of the existence of a dangerously loaded spring gun as a basis for inferring the possession of a deliberate intent. The word "deliberate" is defined by Funk & Wagnalls New Standard Dictionary (1945) as "fully or carefully considering the nature or consequences of an act or measure," "formed after careful consideration, entered upon after deliberation and with fixed purpose." Even gross negligence is *not* equivalent to a deliberate intent to inflict injury. Allen v. Raleigh-Wyoming Min. Co. 117 W. Va. 631, 635, 186 S. E. 612, 614; Duncan v. Perry Packing Co. 162 Kan. 79, 174 P. (2d) 78. The element of "malicious or deliberate intent" required on the part of an employer with respect to an assault on his employe, in order to give the injured employe the right or option of either suing for damages at common law or proceeding under the workmen's compensation act, *is a conscious and deliberate intent directed to the purpose of inflicting an injury,* and such intent may not be inferred from mere negligence, though it be gross. Other jurisdictions are in accord.[13] We need not here decide whether carelessness, indifference, and negligence of an employer may be so wanton as to warrant a judicial determination that his ulterior intent was to inflict injury. In any event, proof of wanton negligence to sustain such a determination would have to be unquestionably clear and forceful in a high degree.

### EXCLUSIVENESS OF REMEDY UNDER WORKMEN'S COMPENSATION ACT

■ Plaintiff's appeal presents another issue. If an employe has sustained injuries from an accident arising out of and in the course of his employment and only a part of such injuries materially impair his employability and are subject to the compensation act, may such employe institute a common-law action against the employer for

[13]Biggs v. Donovan-Corkery Logging Co. 185 Wash. 284, 54 P. (2d) 235; Delthony v. Standard Furniture Co. 119 Wash. 298, 205 P. 379; Heikkila v. Ewen Transfer Co. 135 Or. 631, 297 P. 373; Allen v. Raleigh-Wyoming Min. Co. 117 W. Va. 631, 186 S. E. 612; Castleberry v. Frost-Johnson Lbr. Co. (Tex. Com. App.) 283 S. W. 141, affirming (Tex. Civ. App.) 268 S. W. 771; see, Milwaukee Corrugating Co. v. Industrial Comm. 197 Wis. 414, 222 N. W. 251; Stewart v. McLellan's Stores Co. 194 S. C. 50, 9 S. E. (2d) 35; Annotations, 16 A. L. R. 620 and 68 A. L. R. 301, in re wilful misconduct of employer.

damages for the portion of the injuries which do not materially affect his employability, such as a permanent disfigurement? This issue arises in connection with M. S. A. 176.11, subd. 3(38), which provides compensation:

"For serious disfigurement not resulting from the loss of a member or other injury specifically compensated, materially affecting the employability of the injured person in the employment in which he was injured or other employment for which the employee is then qualified, * * *."[14]

Plaintiff contends that under the above section and pursuant to the court's decision in Lloyd v. Minnesota Valley Canning Co. 224 Minn. 305, 28 N. W. (2d) 697, she may maintain a common-law action for damages for a permanent disfigurement which does not materially affect her employability. She is in error. Said decision, based on appeal from an order sustaining a demurrer to the complaint, involved an action at law, sounding in tort, by an employe against her employer for damages for injuries resulting *only* in serious permanent disfigurement not materially affecting her employability. In other words, the employe sustained no compensable injuries whatever, but only a disfigurement not materially affecting her employability. In the light of the facts upon which the decision was made, the rule of that case is simply that § 176.11, subd. 3(38), by necessary implication, excludes from the coverage of the workmen's compensation act a serious permanent disability which does not materially affect the employability of an employe *who has not simultaneously sustained other injuries which are compensable.*

The issue still to be resolved, therefore, is whether an employe *who in fact has sustained compensable injuries from an accident* may bring an action in tort for damages for a serious permanent disfigurement resulting from the same accident and which does not materially affect her employability. It is immaterial herein whether plaintiff has or has not received compensation benefits or peti-

---

[14]Also, see § 176.11, subd. 3(39), in re compensation for serious disfigurement.

tioned therefor. It is enough to know that she did sustain certain injuries which were in fact covered by the workmen's compensation act. A case fundamentally in point is Hyett v. N. W. Hospital for Women and Children, 147 Minn. 413, 180 N. W. 552. Hyett was injured in his employment and was disabled for a brief period, in the adjustment of which he was paid $44. At the time of the accident, in addition to the foregoing disability, he sustained an independent injury to his left pubic nerve, which left him permanently impotent, but which in no way impaired his ability to perform his work. For this latter injury, the compensation act made no provision for compensation. Hyett brought an action at law to recover damages, and the defendant employer interposed as a defense that the parties were subject to the workmen's compensation act and that Hyett's remedy thereunder was exclusive. Hyett demurred to this defense, and from an order sustaining his demurrer an appeal was taken to this court. In reversing the trial court, we held that where a particular injury results in part in a temporary or permanent disability, and in part in the disfigurement of the person of the employe, or other injury not amounting to a disability, the employe is limited in his relief to that given by the act, and an action at law for the injury not amounting to a disability cannot be maintained. In the same decision (147 Minn. 417, 180 N. W. 553), we pointed out that:

"A personal injury, received at the hands of a wrongdoer, constitutes but one right of action. It cannot be divided into several parts to accord with the elements of damages recoverable therefor. It presents a single controversy to be settled in a single action. 2 Dunnell, Minn. Dig. § 5167. That is elementary, and it is manifest that there was no intention on the part of the legislature to change or abrogate it by the compensation act, and no such intention should be presumed by the court. On the other hand, it is clear that the intention of that body was to present to the employers and employees of the state a comprehensive act embracing their exclusive rights and remedies for accidental or other injuries suffered by the em-

ployee. Morris v. Muldoon, 190 App. Div. 689, 180 N. Y. Supp. 319. If the compensation so provided is deemed inadequate or that the act should be made to include all or any of the common law elements or ingredients of relief found in the negligence law, the change should come about by legislation and not by rule of court."

The workmen's compensation act, insofar as it provides any compensation to an employe accidentally injured in the course of his employment, is exclusive of all other remedies. The law contemplates a reciprocal yielding and giving up of rights existing at common law for the new and enlarged rights and remedies given by the compensation act. Novack v. Montgomery Ward & Co. 158 Minn. 505, 198 N. W. 294. It is elementary that a single wrongful act affecting only one person gives rise to but a single cause of action. Eklund v. Evans, 211 Minn. 164, 300 N. W. 617. Plaintiff apparently assumes, however, that the legislature, in specifically providing for compensation for a permanent disfigurement materially affecting employability, by necessary implication intended to preserve the right of an independent action at law for a nondisabling disfigurement. § 176.11, subd. 3(38). We cannot agree. The obvious purpose of this enactment was merely to insure by express provision that a disabling disfigurement which rendered an employe repulsive or offensive to the sight, whereby he became less acceptable in obtaining future employment, should be justly compensated.[15] It was not thereby intended to place a nondisabling disfigurement in a different category from other noncompensable injuries.

### CONSTITUTIONALITY

Plaintiff asserts that, insofar as she is deprived of her common-law remedy to sue in tort for damages for a serious disfigurement not materially affecting her employability, the workmen's compensation act is unconstitutional in that it violates Minn. Const. art. 1, §§ 2, 4, and 8, art. 3, § 1, and art. 6, § 1, by (1) its encroachment upon the judicial power; (2) by depriving her of the right to trial

[15]See, New York Cent. R. Co. v. Bianc, 250 U. S. 596, 40 S. Ct. 44, 63 L. ed. 1161, affirming 226 N. Y. 199, 123 N. E. 82; Note, 12 N.C.C.A.(N.S.) 653.

by jury; and (3) by depriving her of an adequate remedy for injuries to her person. Although the workmen's compensation act as originally enacted with the provision that any employer or employe could elect *not* to be bound thereby has been held constitutional (Mathison v. Minneapolis St. Ry. Co. 126 Minn. 286, 148 N. W. 71, L. R. A. 1916D, 412), plaintiff now insists that, since the act became compulsory by the abolition of the right of employers and employes to elect not to be bound thereby through the enactment of L. 1937, c. 64 (see L. 1939, c. 265), the basis for its constitutionality no longer exists. It is true that the act was originally held not to impair any constitutional rights because it applied only to such parties as had voluntarily agreed and consented to be bound by its provisions. Mathison v. Minneapolis St. Ry. Co. *supra.* It does not follow, however, that the act in its amended compulsory form is not valid on other grounds. Similar compulsory acts have been held constitutional in other jurisdictions on the basis of the police power.

POLICE POWER AS APPLIED TO EMPLOYER-EMPLOYE RELATIONSHIP

 Clearly, the present act in its compulsory form is well within the scope of legislation justifiably under the inherent police power of the state. In the exercise of this power, which is as flexible and adaptable as the vital needs of our changing society, the state acts as the conservator of the public welfare. The objective of its exercise is the preservation of the public welfare, as distinguished from the protection or advancement of a mere private interest, and the remedy adopted thereunder must be reasonably designed to accomplish its purpose without going beyond the reasonable demands of the occasion. A wide discretion is vested in the legislature in determining when a public welfare need exists and in the selection of an appropriate remedy. State ex rel. Beek v. Wagener, 77 Minn. 483, 80 N. W. 633, 778, 46 L. R. A. 442, 77 A. S. R. 681; 1 Dunnell, Dig. & Supp. §§ 1604, 1605. No one doubts today that the employer-employe relation is affected with a vital public interest, and that there is a reasonable need for its regulation. The increased industrialization of modern society has been accompanied by the increased

industrial disability of employes, a burden which individual employes cannot bear and which constitutes a burden that can be borne equitably and expeditiously only by placing it upon industry as a cost of production. The increased mechanization of industry—with its many attendant and associated problems—has intensified the fatigue and nervous strain of the worker until his accident- or injury-producing conduct, and that of his employer, can no longer be adjudicated in terms of negligence or assumption of risk. In New York Cent. R. Co. v. White, 243 U. S. 188, 207, 37 S. Ct. 247, 254, 61 L. ed. 667, 677, L. R. A. 1917D, 1, Ann. Cas. 1917D, 629, with respect to the compensation act of New York, the United States Supreme Court said:

"* * * One of the grounds of its concern with the continued life and earning power of the individual is its interest in the prevention of pauperism, with its concomitants of vice and crime. And, in our opinion, laws regulating the responsibility of employers for the injury or death of employees arising out of the employment bear so close a relation to the protection of the lives and safety of those concerned that they properly may be regarded as coming within the category of police regulations."

It is unnecessary to dwell in detail upon the varied needs and problems arising out of modern employment which justify the application of the police power, since they are too obvious and have already been ably set forth by others who have also pointed out that workmen's compensation acts similar to that of Minnesota provide an adequate and reasonable remedy.[16]

[16]See, Sayles v. Foley, 38 R. I. 484, 96 A. 340; New York Cent. R. Co. v. White, 243 U. S. 188, 37 S. Ct. 247, 61 L. ed. 667, L. R. A. 1917D, 1, Ann. Cas. 1917D, 629; 58 Am. Jur., Workmen's Compensation, § 9; Cunningham v. N. W. Improvement Co. 44 Mont. 180, 119 P. 554; Lewis and Clark County v. Industrial Acc. Bd. 52 Mont. 6, 155 P. 268, L. R. A. 1916D, 628; Shea v. North-Butte Min. Co. 55 Mont. 522, 179 P. 499; American Coal Co. v. Allegany Co. Commrs. 128 Md. 564, 98 A. 143; State ex rel. Davis-Smith Co. v. Clausen, 65 Wash. 156, 117 P. 1101, 37 L.R.A.(N.S.) 466; Grand Trunk Western Ry. Co. v. Industrial Comm. 291 Ill. 167, 125 N. E. 748;

The exercise of the police power, through our present compensation act, not only provides a remedy that is reasonably appropriate for the disability problems arising out of modern employment, but a remedy that does not violate our fundamental constitutional rights or encroach upon the judicial power of the courts.

## No Encroachment upon Judicial Branch

█ The industrial commission under the compensation act is a quasi-judicial body which exercises certain restricted and qualified powers of determination in the course of its administrative duties. These powers of determination do not partake of the finality of an adjudication, in that the commission is without final authority to decide and render an enforceable judgment, which is the essence of the judicial power. Its awards and determinations are not enforceable by execution or other process until a binding judgment is entered thereon by a regularly constituted court. Administrative or quasi-judicial determinations which are merely preparatory to an order or judgment to be rendered by a court cannot be properly termed judicial. Mackin v. Detroit-Timkin Axle Co. 187 Mich. 8, 153 N. W. 49; Underwood v. McDuffee, 15 Mich. 361, 93 Am. D. 194. In addition, the legislature not only denied an enforceable finality to the commission's powers of factual determination, but also made their exercise subordinate to the judiciary by providing for a review by certiorari by this court of errors of law and on the ground that the commission's findings or orders are unsupported by the evidence. M. S. A. 176.61. In State ex rel. Yaple v. Creamer (1912) 85 Ohio St. 349, 401, 97 N. E. 602, 607, 39 L.R.A.(N.S.) 694, the court observed:

"* * * 'What is judicial power cannot be brought within the ring-fence of a definition. It is undoubtedly power to hear and determine, but this is not peculiar to the judicial office. Many of the acts of administrative and executive officers involve the exercise of

Western Ind. Co. v. Pillsbury, 170 Cal. 686, 151 P. 398; 1 Schneider, Workmen's Compensation Text (Perm. ed.) § 3; Horovitz, Injury and Death Under Workmen's Compensation Laws (1944) pp. 2-10.

the same power.' * * * many boards hear and determine questions affecting private as well as public rights, * * *. 'The authority to ascertain facts and apply the law to the facts when ascertained pertains as well to other departments of government as to the judiciary.' "

In the exercise of the police power, the vesting by the legislature in the industrial commission of quasi-judicial powers—inclusive of the power to determine facts and apply the law thereto in employment-accident controversies—is not in violation of state constitutional provisions for the division of the powers of government or for the vesting of the judicial power in the courts, as long as the commission's awards and determinations are not only subject to review by certiorari, but lack judicial finality in not being enforceable by execution or other process in the absence of a binding judgment entered thereon by a duly established court.

### DENIAL OF JURY TRIAL

Plaintiff erroneously contends that the compensation act is void in that it deprives her of the right to a jury trial in violation of Minn. Const. art. 1, § 4, which provides:

"The right of trial by jury shall remain inviolate, and shall extend to *all cases at law* * * *." (Italics supplied.)

The term "all cases at law" refers to common-law actions as distinguished from causes in equity and certain other proceedings.[17] Art. 1, § 4, preserves unimpaired the right of jury trial as it existed by the laws of the territory at the time our state constitution was adopted, and such right is thereby neither extended nor limited.[18]

---

[17]State ex rel. Clapp v. Minnesota Thresher Mfg. Co. 40 Minn. 213, 41 N. W. 1020, 3 L. R. A. 510; Swanson v. Alworth, 168 Minn. 84, 209 N. W. 907; State ex rel. Olson v. Guilford, 174 Minn. 457, 219 N. W. 770, 58 A. L. R. 607; see, State ex rel. Attorney General v. Stoughton Club, 163 Wis. 362, 158 N. W. 93.

[18]Whallon v. Bancroft (1860) 4 Minn. 70 (109); Board of Co. Commrs. v. Morrison (1875) 22 Minn. 178; Peters v. City of Duluth (1912) 119 Minn. 96, 137 N. W. 390, 41 L.R.A.(N.S.) 1044; Reliance Auto Repair Co. v. Nugent

Workmen's compensation proceedings were unknown to this jurisdiction when Minnesota adopted its constitution. Furthermore, it is to be noted that an action at law is a proceeding before a court and does not pertain to proceedings before quasi-judicial bodies such as the industrial commission. It should be remembered that where new rights and remedies are created which were unknown at common law, the giving or withholding of a jury trial is a legislative privilege. Peters v. City of Duluth (1912) 119 Minn. 96, 137 N. W. 390, 41 L.R.A.(N.S.) 1044, and note; Johnson v. Peterson (1903) 90 Minn. 503, 97 N. W. 384; Yanish v. Pioneer Fuel Co. (1896) 64 Minn. 175, 66 N. W. 198; Roussain v. Patten (1891) 46 Minn. 308, 48 N. W. 1122; 11 Minn. L. Rev. 449. In substituting a new, adequate, and fundamentally different remedy upon a cause of action for one for which there was originally at common law a remedy involving the right of trial by jury, the legislature may withhold the right of jury trial. As hereinafter noted, the remedy provided by the workmen's compensation act is an adequate substitute for an action at law for damages for personal injuries sustained by an employe. It follows that under our constitution, as applied to civil cases, the right of jury trial is incident only to actions at law, and when a certain action at law is abolished the right of jury trial incident thereto is no longer involved. See, 58 Am. Jur., Workmen's Compensation, § 17.

ADEQUACY OF REMEDY UNDER COMPENSATION ACT

 In her final assault upon the workmen's compensation act, plaintiff asserts the act is void in that she is deprived of an adequate remedy in violation of Minn. Const. art. 1, § 8, which provides that "Every person is entitled to a certain remedy in the laws for all injuries or wrongs" received in his person, property, or character. By reason of other injuries which are compensable, plaintiff's exclusive remedy is under the workmen's compensation act, which

(1914) 159 Wis. 488, 149 N. W. 377, Ann. Cas. 1917B, 307; see, 11 Minn. L. Rev. 449.

provides no compensation for a disfigurement which does not affect her employability.

In Allen v. Pioneer-Press Co. 40 Minn. 117, 122, 41 N. W. 936, 938, 3 L. R. A. 532, 12 A. S. R. 707, Mr. Justice Mitchell said:

"The guaranty of a certain remedy in the laws for all injuries to person, property, or character, and other analogous provisions, such as those against exacting excessive bail, imposing excessive fines, inflicting cruel and inhuman punishments, and the like, inserted in our bill of rights, the equivalents of which are found in almost every constitution in the United States, are but declaratory of general fundamental principles, founded in natural right and justice, and which would be equally the law of the land if not incorporated in the constitution. There is unquestionably a limit in these matters, beyond which if the legislature should go, the courts could and would declare their action invalid. But inside of that limit there is, and necessarily must be, a wide range left to the judgment and discretion of the legislature, and within which the courts cannot set up their judgment against that of the legislative branch of the government. *These constitutional declarations of general principles are not, and from the nature of the case cannot be, so certain and definite as to form rules for judicial decisions in all cases, but up to a certain point must be treated as guides to legislative judgment, rather than as absolute limitations of their power.* And in determining whether in a given case a statute violates any of these fundamental principles incorporated in the bill of rights, it ought to be tested by the principles of natural justice, rather than by comparison with the rules of law, statute or common, previously in force.

"Again, it must be remembered that *what constitutes 'an adequate remedy' or 'a certain remedy' is not determined by any inflexible rule found in the constitution, but is subject to variation and modification, as the state of society changes.* Hence a wide latitude must, of necessity, be given to the legislature in determining both the form and the measure of the remedy for a wrong." (Italics supplied.)

By the weight of authority, it is recognized that compulsory workmen's compensation acts similar to ours do provide a remedy which is an adequate substitute for the common-law or statutory action for damages for injuries sustained by an employe in his employment.[19] Although the plaintiff, by becoming subject to the workmen's compensation act as an employe, has lost a right to sue at law for all damages incurred from injuries resulting from her employer's negligence, she has been fully compensated for this loss by receiving in return a remedy which gives her a certainty of compensatory relief, without the delay of litigation and without regard to any negligence or assumption of risk on her part. In return for the fixed liability of her employer, whether he has been negligent or not, it naturally follows that the employe here has been required to surrender something in return, such as the right to damages for certain disabilities which do not affect her employability where she has otherwise become entitled to compensation for associated injuries. In balancing the employe's advantages against the disadvantages—and there are many of them in connection with the uncertainty and delay of a common-law action—we cannot say that the workmen's compensation act has not given plaintiff an adequate substitute remedy.

The order of the trial court denying plaintiff's motion for a new trial as against the defendant William Beckman is affirmed; and the order of the trial court denying the motion of the defendant John G. Andrist for judgment *non obstante* or a new trial is reversed with directions to enter judgment in his favor.

Affirmed as to defendant William Beckman; reversed as to appeal of defendant John G. Andrist.

---

[19]New York Cent. R. Co. v. White, 243 U. S. 188, 37 S. Ct. 247, 61 L. ed. 667, L. R. A. 1917D, 1, Ann. Cas. 1917D, 629; In re Jensen v. Southern Pac. Co. 215 N. Y. 514, 109 N. E. 600, L. R. A. 1916A, 403, Ann. Cas. 1916B, 276, reversed on other grounds, 244 U. S. 205, 37 S. Ct. 524, 61 L. ed. 1086, L. R. A. 1918C, 451, Ann. Cas. 1917E, 900; State ex rel. Davis-Smith Co. v. Clausen, 65 Wash. 156, 117 P. 1101, 37 L.R.A.(N.S.) 466; Annotation, L. R. A. 1917D, 57; see, Restatement, Agency, § 528; 58 Am. Jur., Workmen's Compensation, § 20.

MR. JUSTICE FRANK T. GALLAGHER took no part in the consideration or decision of this case.