## CLARA ANDERSON v. RUSSELL MILLER MILLING COMPANY AND ANOTHER.[1]

No. 30,331.

February 7, 1936.

[1]Reported in 267 N. W. 501.

*Gleason & Ward, Charles A. Sawyer,* and *Philip Neville,* for relator.

*Durham & Swanson,* for respondents.

*Thomas F. Clifford, amicus curiae,* filed a brief in support of relator's application for reargument.

STONE, JUSTICE.

*Certiorari* to the industrial commission to review an order denying compensation for death.

Petitioner is the widow of Adolph M. Anderson, who died August 1, 1933, from hydrocyanic gas poisoning on the premises of his employer. The determinative question is whether the cause of his death arose out of and in the course of his employment.

Mr. Anderson had been employed by respondent Russell Miller Milling Company for 29 years, the last five at the Minneapolis mill where death claimed him. On the night of July 31, 1933, the mill was fumigated with deadly hydrocyanic gas. The job was done by a fumigating company. During the afternoon its employes sealed the doors and windows. It was the first time during Mr. Anderson's experience at the Minneapolis mill that he had witnessed such preparations. Always before during the five years he had been employed there the mill had been fumigated with harmless tear gas sprayed by hand. The fumigation was to be completed and the mill ready to resume operations the following morning. The men were to report for work at the usual time, eight o'clock a. m. However,

the evidence clearly shows. that by the warning signs posted on all the doors, if not otherwise, the men were informed of the deadly character of the gas and warned not to enter, the testimony for the respondents being that each of the workmen was instructed not to enter the building on the morning following the fumigation until told to do so by his superior.

Of Mr. Anderson's fellow workers who testified, only two denied having been personally so warned. Only one denied knowledge of the dangerous character of the gas. A third testified that, while he could not remember any special warning, he could not have escaped knowledge, from contact with other employes and the posted signs, that poisonous gas was being used and that he was not to enter until told to do so.

On the third floor of the mill is a dressing room, equipped with lockers and shower baths, where employes change clothes before and after work. On the morning of August 1 Mr. Anderson arrived, as was his custom, at about 7:30 o'clock. He was the first one there. Punching the time clock, he entered the mill, went to the third-floor dressing room, and had started to change his clothes when he was overcome and killed by the gas.

■ The testimony of the head miller, Mr. Turner, that the preceding day he instructed Mr. Anderson not to enter the mill on the morning of August 1 until told to do so, as well as the testimony of Mr. Rubishak, an assistant foreman, who was posted as watchman at the door through which Mr. Anderson entered, that he told him not to go in because it was not yet safe, is now objected to (there was no objection when it was received) on the ground that it was inadmissible under 2 Mason Minn. St. 1927, § 9817, as conversation with one since deceased by one interested in the outcome of the action. Turner and Rubishak each owned a few shares of stock in the holding company which has a controlling interest in respondent company. Whether that brought their testimony within the statute under the rule of Peterson v. Merchants Elev. Co. 111 Minn. 105, 126 N. W. 534, 27 L.R.A. (N.S.) 816, 137 A. S. R. 537, and Caldwell M. & E. Co. v. L. L. May Co. 141 Minn. 255, 169 N. W. 797, need not be decided. Under other facts disclosed by uncon-

tradicted and unimpeached testimony, the conclusion is irresistible that Mr. Anderson's death did not arise out of and in the course of his employment.

■ When Mr. Anderson reached the mill on the fatal day he could have seen, had he looked at the windows, that many were still sealed. The door through which he ordinarily entered was locked. The boiler room door, which was unlocked and through which he entered, was closed. But, tacked on it at eye level was a sign warning him to keep out. That sign, in evidence, is a piece of white cardboard, 20 by 12 inches, upon which in red is the word "DANGER" in letters two and one-half inches high, a red skull and crossbones three and one-half by three inches, and the words "KEEP AWAY—HYDROCYANIC ACID GAS—FUMIGATION" in red letters an inch and a quarter to two inches high. Identical signs were on all entrances. Moreover, Mr. Rubishak was posted as a guard at the boiler room door. Aside from the conversation between him and decedent, his undisputed and unobjectionable testimony is that he tried by physical force to keep Mr. Anderson from entering. But the latter managed to duck under his arm and shove past into the building.

The undisputed facts make it plain that even if Mr. Anderson did not appreciate the danger he yet wilfully disobeyed his employer's positive instruction to stay out. Hence he was not in the course of his employment at the time of his asphyxiation. His disobedience was not of a mere instruction concerning the manner of doing his work. The question is not, as it was in Olson v. Robinson, Straus & Co. 168 Minn. 114, 116, 210 N. W. 64, whether the employe "had departed from" his work "to such an extent" that the accident "cannot be said to have arisen out of the employment." It is rather a case where the employe had not gotten into the "course" of his employment for the day. The order violated was one which prevented beginning of the employment for that day until the signs, with their flared warning of danger, were removed from the entrances and the mill opened to the employes.

Violation of an order which takes an employe outside of the sphere of his employment at the time of injury bars compensation.

Rautio v. International Harv. Co. 180 Minn. 400, 231 N. W. 214; Eugene Dietzen Co. v. Industrial Board, 279 Ill. 11, 116 N. W. 684, Ann. Cas. 1918B, 764; Gacesa v. Consumers Power Co. 220 Mich. 338, 190 N. W. 279, 24 A. L. R. 675; Annotation, 23 A. L. R. 1161, 1172. Hence, violating an order which prevents beginning of employment must have the same result.

That Mr. Anderson had punched the time clock and was preparing for the day's work does not help the case for compensation. It does not follow, under the established facts, that because his "time" for the day had begun his employment had also. The employer could start the one and delay the other. That it had done everything reasonably possible to prevent the beginning of the employment for the day, until the mill was opened to the employes, is° beyond question. Mr. Anderson's legal status in the mill was that of a trespasser rather than an employe.

The order denying compensation is affirmed.

JULIUS J. OLSON, JUSTICE (dissenting).

Anderson had been an employe of respondent employer over a period of more than 29 years, the best part of his working life. He was nearing his sixtieth birthday when the fatal accident occurred. Unemployment at the time of his death, and over a long period immediately preceding, was the most important local and national problem. There is no suggestion that he was ever disobedient to orders. It is obvious, too, that he would not risk his life by going into the mill and thereby expose himself to lethal gases had he known there were such. In the very nature of things he was doing what to him appeared to be his duty. His job depended upon obedience to rules, and his own self-preservation (had he been informed of the danger) demanded it. To say that he was a "trespasser" upon or within his employer's premises at the time of this unfortunate accident is to my mind unwarranted.

He came upon his employer's premises at the usual time and in the usual way. He went about his work as always had been his custom. When he was found unconscious in the locker room he had commenced changing his street clothes for those in use when at work, all in accordance with his daily and customary chore.

Damages are not sought under part 1 of the compensation act. 1 Mason Minn. St. 1927, § 4261. Under that section damages may be recovered by the injured employe when the injury was caused "by accident arising out of and in the course of his employment, of which injury the actual or lawfully imputed negligence of the employer is the natural and proximate cause." And if "the employe was himself not wilfully negligent at the time of receiving such injury" damages may be recovered. § 4262. If such were the basis for the present cause there might be reason for denial of recovery; but it is not. Compensation is sought and must be obtained, if at all, under part 2 of the act, § 4268, *et seq.* Under § 4269 it is provided:

"* * * compensation according to the schedules hereinafter contained shall be paid by every such employer, in every case of personal injury or death of his employe, caused by accident, arising out of and in the course of his employment, without regard to the question of negligence, *except accidents which are intentionally self-inflicted or when the intoxication of such employe is the natural or proximate cause of the injury,* * * *." (Italics mine.)

So the only issue to be here determined is whether Anderson, at the time and place of accident, was upon or within the working premises of his employer, in the course of his employment and "within the hours of service." In Simonson v. Knight, 174 Minn. 491, 494, 219 N. W. 869, 870, this court said:

"To accomplish the purpose of the law it must be held that, for the purposes of compensation, a workman is within the hours of service when, having put aside his own independent purposes, he has entered the premises of his employer appurtenant to the place where his service is rendered for the purpose of beginning such service immediately or within a reasonable time and is approaching the place thereof by an avenue customarily used by employes."

See also Novack v. Montgomery Ward & Co. 158 Minn. 495, 198 N. W. 290; Lineau v. N. W. Tel. Exch. Co. 151 Minn. 258, 260, 186 N. W. 945.

It seems clear to me from this record that Anderson had entered upon his customary service. He had punched the time clock, as was his custom, was in the act of changing his clothes to begin his day's work when the accident occurred, and was actually within and upon his employer's working premises.

True, he knew that the mill had been fumigated the night before. But it is equally clear that he did not realize the dangerous qualities and lethal character of the gas employed. At other times when the mill had been undergoing such treatment other gases had been used neither lethal nor harmful to human life. If we eliminate from consideration the testimony of Turner and Rubishak as to conversations had with decedent, there is very little left upon which to hang a defense. So it seems to me we must determine whether these men, admittedly stockholders in the holding company owning the entire stock issue of the employer, are under the statute precluded from testifying to such conversations. In my opinion they should be so precluded. They have an interest that is direct and, to them at least, substantial. (Turner was the owner of 53 shares and Rubishak four out of a total issue of 82,231 shares.) The fact that the stock ownership of each is comparatively small as compared with the entire stock issue is not the basis for excluding such testimony under the statute. If these men had been the owners of 100 shares in such holding company as American Telephone & Telegraph Company and the proceeding was one where the same question arose as to it, or one of its wholly owned subsidiaries, there can be little doubt that they would be precluded from testifying. There the ownership of 100 shares would be much less in proportion to the total issue outstanding than the interests possessed by these witnesses in the corporation here involved. The question should not, nor can it, be based upon the number of shares owned by an individual, but rather whether he himself has an interest of such importance that his testimony is likely to be influenced thereby. As humans we are all naturally swayed by interest. We think of ourselves first. These men cannot be differently classified. Even "the ox knoweth his owner, and the ass his master's crib."

The so-called instructions were verbal. The fact that they are labeled "instructions" cannot change the statutory rule against the admissibility of such evidence. That the trier of fact was, of the view that such testimony was essential to decision appears beyond question in the record. Mr. Turner while being examined in behalf of respondents, reference being had to the so-called "instructions," was asked:

Q. "What instructions did you give him?

By Mr. Gleason: "Objected to as incompetent, the decedent being dead, and calling for a self-serving and privileged communication in view of the fact that Mr. Anderson is now dead, and we cannot controvert it.

By the referee: "Of course *if you don't permit this witness to testify we will have no information on which to base a finding as to whether or not he was notified,* and I overrule your objection." (Italics mine.)

Then follows the statement of the witness that, "I gave Mr. Anderson instructions that we were going to fumigate with cyanide and not to come inside of the mill until he had instructions to come in." And the witness Rubishak testified, while likewise being examined by respondent's counsel:

"I told him, I said: 'Mr. Anderson, you can't go in the mill, there is gas in there, it is not ready to go in yet'; and he said: 'I don't care, I know what it is. I don't worry about that.' I got a hold of him by the shoulder and I pushed him back and I said: 'For God's sake, don't go in, you know better than that'; and he said: 'Oh, heck, I know what it is'; and he just shoved right in, and I just let him go in. I didn't want to fight with him."

If the quoted conversation were eliminated from his testimony, as it should be, then indeed there is little left upon which to base a defense.

It is true, of course, that the circumstance respecting posted placards might be found sufficient to put Anderson on notice that there was something dangerous respecting the fumigation. But such proof would after all simply go to the question of lack of rea-

sonable care on his part or perhaps assumption of risk. These defenses are not under this statute permitted to stand in the way. Therefore, so it seems to me, the so-called "other facts" in the case, claimed to afford respondents an adequate defense, fall flat. The record is barren of anything suggesting "intentionally self-inflicted" injury or that its cause was founded upon "intoxication" of the employe.

With respect of Rubishak's authority to act for his employer, the record discloses that he was only a night watchman, "temporarily at that time they were fumigating." His authority as assistant foreman was limited to the warehouse. Anderson's work was in the milling department, and as such he had nothing to do with Rubishak. In his testimony Rubishak said: "Very seldom I saw him come in because I was on a different crew altogether, in a different department."

While not directly in point yet of persuasive value is Olson v. Robinson, Straus & Co. 168 Minn. 114, 210 N. W. 64, where the first syllabus paragraph reads:

"The compensation act is to be liberally construed to secure to employes the benefits intended, and an employe is not necessarily placed outside the protection of the act by disobeying an order."

Cited under the syllabus in that case, 168 Minn. 114, are: "Workmen's Compensation Acts, C. J. p. 40 n. 95; p. 86 n. 84 New; p. 115 n. 37. See notes in 23 A. L. R. 1166; 26 A. L. R. 166; 5 R. C. L. Supp. p. 1574 et seq." To these should be added cases cited in annotations under workmen's compensation, 58 A. L. R. 198, and 83 A. L. R. 1211.

As I read the record, if there was any violation of orders or directions by him it was while within the scope and sphere of his employment and as such not at all like Rautio v. International Harv. Co. 180 Minn. 400, 404, 231 N. W. 214, 216, where the employe had "deliberately, *for purposes of his own,* put himself in the danger zone." (Italics mine.)

The rule stated in Kelly v. National Packing Box Co. 204 App. Div. 614, 616, 198 N. Y. S. 501, 502, seems applicable here:

"It is not the performance in a prohibited manner of the thing he is employed to do but the attempt, in disobedience of an order, to undertake something wholly outside of his line of duty, which breaks the relationship of employer and employe."

And the supreme court of Wisconsin in Frint Motor Car Co. v. Industrial Comm. 168 Wis. 436, 170 N. W. 285, in the first syllabus paragraph said:

"A mechanic was given charge of his employer's pit at automobile races, with instructions to work on the cars there and not to leave the pit. Contrary to orders he left the pit and stood upon the fence at the inside of the race track. While there, during a race, he saw one of his employer's cars stop on the track a short distance away. He ran toward it, but before reaching it was struck by an oncoming car and killed. Held, that he was at the time performing service growing out of and incidental to his employment, and that the mere fact that he had disobeyed orders did not preclude an award of compensation for his death."

The supreme court of Pennsylvania in Gurski v. Susquehanna Coal Co. 262 Pa. 1, 104 A. 801, in the first syllabus paragraph said:

"Where a miner met his death from noxious gases in a part of his employer's mine to which he had gone to get tools with which to work, although he had been told not to go into that part of the mine, his death was the result of an accident occurring in the course of his employment within the meaning of the Workmen's Compensation Act * * *."

There are many other cases bearing upon this subject which to my mind should lead to a reversal. Only a few will be specifically cited here: Republic I. & S. Co. v. Industrial Comm. 302 Ill. 401, 134 N. E. 754; Nickerson's Case, 218 Mass. 158, 105 N. E. 604, Ann. Cas. 1916A, 790; Gray v. Industrial Accident Comm. 34 Cal. App. 713, 168 P. 702; McNicholas v. Dawson & Son [1899] 1 Q. B. 773.

Considerations of fairness and human experience induce me to believe that Anderson in good faith and without knowledge of the hidden dangers created by the fumigation entered into and upon

his employer's premises and was within the scope and hours of service of his employment at the time of his asphyxiation. His widow should be allowed compensation.

UPON APPLICATION FOR REARGUMENT.

On May 15, 1936, the following opinion was filed:

STONE, JUSTICE.

Relator's petition for rehearing is denied, but it has lead to a careful reëxamination of the record in the light of the diligent and searching argument advanced in support of the petition.

We consider our former decision right in deciding the case as matter of law. But assuming, solely for the purpose of argument, that the determinative issue was not susceptible of decision as matter of law, the case is in this status:

It has been once remanded to the industrial commission for a rehearing, or an additional hearing, upon the argument that the incompetent evidence had been admitted. Upon a motion on that ground a rehearing was denied. But the point must have been considered by the commission notwithstanding, and, unanimously, their original decision denying compensation was adhered to.

Hence, even though now we did not pass upon the determinative question as one of law, we would yet be confronted with the question whether the commission's findings are "based only upon competent evidence." 1 Mason Minn. St. 1927, § 4313. The admission of the incompetent evidence having been explicitly considered and the commission having adhered to its decision, we would be unable to say now that it was based upon other than the ample competent evidence that is in the record to support it.

The statute, 1 Mason Minn. St. 1927, § 4313, is somewhat anomalous in that it declares that the commission "shall not be bound by common law or statutory rules of evidence," and yet requires that their findings "be based only upon competent evidence." We construe that to mean that, whatever incompetent evidence is admitted by the commission in violation of "common law or statutory rules of evidence," yet, where the incompetence of some of the evidence has been particularly pressed upon the commission upon a motion

for rehearing, we cannot say, where there is so much competent evidence as there is here in support of their decision, that it was not based solely thereon.

JULIUS J. OLSON, JUSTICE (dissenting).

My views are expressed in the dissent heretofore filed, and to these I adhere.

DEVANEY, CHIEF JUSTICE, took no part in the consideration or decision of this case.

