## STEPHEN KASELNAK v. FRUIT DISPATCH AND ANOTHER.[1]

April 21, 1939.

No. 32,004.

*Mark F. Crotty* and *C. E. Warner,* for relator.
*Reynolds & McLeod,* for respondents.

JULIUS J. OLSON, JUSTICE.

*Certiorari* brings for review the propriety of an order of the industrial commission denying relator-employe compensation.

On and prior to June 25, 1937, Kaselnak, the employe, was engaged by respondent Fruit Dispatch as a messenger to accompany carloads of fruit shipped to consignees in the trade territory of the employer in this country and in Canada. On his last trip, the one giving rise to the accident here involved, he accompanied two carloads of bananas from Minneapolis to Weyburn, Saskatchewan,

[1]Reported in 285 N. W. 482.

located some 500 miles west of Winnipeg. The shipment was routed over the Northern Pacific Railway to Emerson and from there over the Canadian Pacific Railway, via Winnipeg. His instructions were to return by the same route. His transportation was provided for by virtue of a contract between his employer and the railway companies whereby he was furnished with free transportation all the way from Minneapolis to his destination at Weyburn, and on his return trip he was to pay half fare from there and via Winnipeg, to Emerson, a town located on the Canadian side of the border between Minnesota and Manitoba. From there to Minneapolis his transportation by rail over the Northern Pacific was without charge. Whatever transportation expense he incurred between Weyburn and Emerson was to be refunded to him by his employer upon return to Minneapolis and showing receipt therefor. Before starting out on the trip the employer's manager inquired whether he had sufficient money for the trip. He was informed that relator had $15. (In event of insufficient funds being possessed by the employe to make the return trip money would have been advanced to him by his employer upon request.) On his way to Winnipeg his only expense was the cost of three meals. Arriving there late in the afternoon, as the fruit cars were switched to be picked up by the midnight train for Weyburn, he "took the occasion to look around Winnipeg a bit, getting drunk and apparently losing his money." He managed, however, to make his train connection for Weyburn and there delivered his consignment, informing the consignee that he had no funds but had wired his employer for such. This was not true. He had sent no wire. If he had done so the employer would have provided them. The consignee offered to make arrangements for his meals and hotel expenses until funds could arrive. But instead of wiring for such or attempting to return by the same route over which he had come and, "as he had been instructed to do," he undertook "to steal train rides back" by another railroad running to the south of Weyburn. He succeeded in getting as far as Portal, North Dakota, a port of entry and the town where the Soo Line passes through from Canada into this country and affords direct rail connection with his destination, Minneapolis. He testi-

fied that he thought the Soo Line would honor his Northern Pacific pass, but the station agent said this could not be done. That evening, while attempting "to steal a ride on an eastbound Soo Line freight train," he fell and was severely injured. He is badly crippled, having lost both of his legs.

Upon these facts the commission denied compensation, being of opinion that—

"in attempting to bum his way across country back to Minneapolis over a route contrary to his instructions and [in] attempting to steal rides on moving trains he departed from the course and scope of his employment and voluntarily engaged upon a course of conduct and incurred risks which cannot reasonably be said to have been contemplated in the employment."

The conclusion so reached was based upon the following authorities cited by the commission: State ex rel. Miller v. District Court, 138 Minn. 326, 328, 164 N. W. 1012, L. R. A. 1918F, 881; Novack v. Montgomery Ward & Co. 158 Minn. 495, 198 N. W. 290; Brokmeier v. Lamb, 170 Minn. 143, 212 N. W. 187; 71 C. J. p. 669 [§ 410]4, and cases cited under note 54[c].

The first question is whether the findings are sustained by the record, and, next, whether the findings if so sustained support the conclusion of nonliability.

■ Examination of the record establishes that there is no substantial dispute with respect to the facts. They are as heretofore related and justify the finding that relator's injury did not arise out of or during the course of his employment.

■ In State ex rel. Miller v. District Court, *supra*, this court quoted with approval from an opinion written by Mr. Chief Justice Rugg in McNicol's Case, 215 Mass. 497, 102 N. E. 697, L. R. A. 1916A, 306, as follows (138 Minn. 328, 164 N. W. 1013, L. R. A. 1918F, 881):

" 'It (the injury) "arises out of" the employment, when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Un-

der this test, if the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises "out of" the employment. But it excludes an injury which cannot fairly be traced to the employment as a contributing proximate cause and which comes from a hazard to which the workman would have been equally exposed apart from the employment. *The causative danger must be peculiar to the work* and not common to the neighborhood. *It must be incidental to the character of the business and not independent of the relation of master and servant.* It need not have been foreseen or expected, but *after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence.'* " (Italics supplied.)

And so here (138 Minn. 328, 164 N. W. 1013, L. R. A. 1918F, 881), "when he sought other methods by which to accomplish his tasks, he departed from the scope or ambit of his employment, and while so doing was not protected by the compensation act." The needless hazards incurred by the employe in proceeding as he did might well lead the commission to the conclusion that thereby he (170 Minn. 146, 212 N. W. 188) "voluntarily incurred an additional risk or hazard not usual to his work and not contemplated by the contract of employment or incidental thereto." (Compare Anderson v. Russell Miller Milling Co. 196 Minn. 358, 267 N. W. 501.)

Obviously, we think, the facts in Howlett v. Midwest Distributors, Inc. 202 Minn. 247, 277 N. W. 913; Campbell v. Connolly Const. Co. 179 Minn. 416, 229 N. W. 561; Moore v. J. A. McNulty Co. 171 Minn. 75, 213 N. W. 546, and Korhonen v. Missabe Ice Co. 153 Minn. 150, 189 N. W. 931, cited and relied upon by the employe, are so clearly distinguishable from those here presented as not to bring them into conflict with the cases cited and relied upon by the commission.

Writ discharged and order affirmed.

MR. JUSTICE HILTON, incapacitated by illness, took no part.