## MARY ELIZABETH WEIDENBACH v. CLAYTON MILLER, SOLE TRADER *d. b. a.* MINNETONKA BEVERAGE COMPANY, AND ANOTHER.[1]

July 11, 1952.

No. 35,755.

*C. E. Warner* and *Ralph Foster,* for relator.
*Reynolds & McLeod* and *C. C. Gilmore,* for respondents.

KNUTSON, JUSTICE.

Certiorari to the industrial commission to review a decision denying compensation benefits to the dependent of a deceased employe.

[1]Reported in 55 N. W. (2d) 289.

The facts are not in dispute. Decedent was employed as a driver salesman by Clayton C. Miller, who owned and operated the Minnetonka Beverage Company. His work required him to take orders and deliver pop and beer to customers on a route which varied somewhat from day to day. On November 14, 1950, part of his route took him along a public highway that followed the shore of Lake Minnetonka. On that day he was accompanied by employer, decedent doing the driving. As they drove west along the highway, they observed a man floundering in the water of the lake. He had broken through the ice and was yelling for help. The testimony of employer, who was called for cross-examination under the statute, can best describe what thereafter took place:

"Q. What did you see as you drove along at this spot?

"A. We saw the men out on the lake.

"Q. Do you know who saw the men first?

"A. That I wouldn't know. I don't know who saw them first. I wouldn't know whether he saw them before I did or not.

"Q. As you drove west were they on your left or right?

"A. They were on my left.

"Q. On your left?

"A. Yes.

"Q. How far were these men out from the truck?

"A. Oh, I would say 500 feet, maybe a little more, you know. It is a guess.

"Q. And what were those men doing?

"A. Well, there wasn't two men, only one that we saw.

"Q. One man. What was the one man doing?

"A. He was floundering in the water and hollering for help.

"Q. What did you do?

"A. Well, we stopped the truck and—that is, Earl stopped the truck, he was driving, and run over to where the accident was.

"Q. Did you make any statement to Earl before he stopped the truck?

"A. My recollection—I don't remember the exact words but the sum and substance was, I said: 'There is a man in the lake', and I

believe that I—I am not positive now, it has been a long time; seems to me I said, 'We better stop'.

"Q. 'Better stop'?

"A. There might be a possibility—I don't remember whether I said that or not.

"Q. Something like that?

"A. Something like that, yes, or 'Shall we stop?' Or something to that effect. I don't remember just what.

"Q. Then Earl stopped the truck?

"A. Yes.

"Q. Then what did you do?

"A. Well, he was on the left side and he jumped out and of course I had to run way around the truck and he leaped over the fence, being a younger man than I, and of course, he was clear over in the lake when I got there and was—oh, I would say 250 feet away, we had to run through some tall rushes and grass there and he was out on the ice when I got to the lake.

"Q. How did you go out to the lake?

"A. I followed him. I had to climb, I couldn't leap over like these athletes do.

"Q. And then what did Earl do?

"A. Well, he was out there and shoved a limb out to the man that was out in the hole when I got there, when I got to the lake.

"Q. What did you do then, Mr. Miller?

"A. Well, I see the ice was kind of shaky so I told him he better come to shore, over where the ice was thicker, and as he turned, why, then he broke through.

"Q. When you said to Earl: 'There is a man in the lake, you better stop', or words to that effect, what did you have in mind?

"A. Well, I don't know. I suppose help is about what anybody would naturally have in mind when you see somebody drowning.

"Q. You had in mind trying to save a life?

"A. I suppose that was probably the idea. It wouldn't be curiosity."

After employe broke through the ice, Miller tried to help him. He broke a limb off a tree and pushed it out to employe, but about that time he, too, broke through the ice and could render no further assistance. Through the help of others who came to his rescue, Miller was pulled out of the water, but employe drowned.

The only question raised here is whether employe came to his death because of an accident arising out of and in the course of his employment. The referee found against claimant, and on appeal his findings and determination were affirmed by the commission.

Much has been written by courts and authors of articles and texts in attempting adequately to define the "deceptively simple and litigiously prolific"[2] statutory phrase "arising out of and in the course of employment." Our cases, like those from most other jurisdictions, indicate the difficulty of formulating a comprehensive definition that will fit all cases which might arise. Reference to a few will suffice to show that it is probably better not to attempt such comprehensive definition.

In State ex rel. Miller v. District Court, 138 Minn. 326, 164 N. W. 1012, L. R. A. 1918F, 881, we quoted with approval the definition of Mr. Chief Justice Rugg in the famous and often-cited McNicol's Case, 215 Mass. 497, 102 N. E. 697, L. R. A. 1916A, 306. This definition was again approved in Kaselnak v. Fruit Dispatch, 205 Minn. 198, 285 N. W. 482.

The Massachusetts court in the later Caswell's Case, 305 Mass. 500, 502, 26 N. E. (2d) 328, 330, said:

"* * * It [the injury] need not arise out of the nature of the employment. An injury arises out of the employment if it arises out of the nature, conditions, obligations or incidents of the employment; in other words, out of the employment looked at in any of its aspects."

In discussing the modern trend, Samuel B. Horovitz, in an article entitled *The Litigious Phrase: "Arising out of" Employment,* 3 NACCA L. J. 15, 39, says:

---

[2]Cardillo v. Liberty Mut. Ins. Co. 330 U. S. 469, 479, 67 S. Ct. 801, 807, 91 L. ed. 1028, 1037.

"Because of the changing concept of 'arising out of,' many courts have now accepted the broader definition, taken from the later English and modern American cases, that:—

" 'An injury arises out of the employment if it arises out of the nature, conditions, obligations, or incidents of the employment; in other words, out of the employment looked at in any of its aspects.' 'It need not arise out of the nature of the employment.'

"Under such a broad definition, as well as under narrower rules, it is not necessary that the injury be one which ought to have been foreseen or expected. Even unusual or extraordinary consequences of the employment may well be compensable. The risk insured is not only the foreseeable one, but the risk which, after the event, can be seen to have its origin in the nature, conditions, obligations, or incidents of the employment. That it resulted in murder or rape, instead of merely a broken bone, is immaterial."

In discussing the McNicol's Case, Horovitz says (*Id.* 47):

"The older Massachusetts definition (formerly widely quoted, now antiquated) required, in addition, that 'the causative danger must be peculiar to the work and not common to the neighborhood.' "

See, also, Horovitz, *Current Trends in Basic Principles of Workmen's Compensation*, 12 Law Society of Massachusetts Journal, 465, 513.

In Olson v. Trinity Lodge, 226 Minn. 141, 32 N. W. (2d) 255, we cited with approval Caswell's Case, 305 Mass. 500, 26 N. E. (2d) 328, *supra;* and again in Breimhorst v. Beckman, 227 Minn. 409, 421, 35 N. W. (2d) 719, 728, where we applied the same definition, we said:

"* * * It is not primarily a question of whether the hazard is peculiar to the employment, but whether the employment is the predominant factor in peculiarly exposing the workman—in a different manner and in a greater degree than if he had been pursuing his ordinary personal affairs—to a hazard which may or may not be peculiar to or exclusively associated with the employment, and which hazard, though part of the general working environment, may

be in direct consequence of an injury-producing act or event produced wholly within or *without* the orbit of work done for the employer by the claimant or others."

The difficulties inherent in attempting to formulate an all-inclusive definition of the phrase involved has been recognized by students of the subject, authors of articles and texts, and courts alike. In Horovitz, *The Litigious Phrase: "Arising out of" Employment*, 3 NACCA L. J. 40, he says:

"The truth is that no exact formula can be stated which will automatically solve every case. The statement of the rule is easier than its application. As times change and a broader and more humane policy to protect workers and dependents evolves, the formula necessarily becomes wider and includes a greater field. Hence the circumstances of each case are often vital."

In Riesenfeld, *Forty Years of American Workmen's Compensation*, 35 Minn. L. Rev. 525, 544, we find the following acknowledgment of the difficulty of formulating such definition:

"As a result of the extreme difficulties encountered in the ascertainment of whether or not the requisite employment connection is present some decisions, spearheaded by the federal Supreme Court itself, have recently come to admit that there is a twilight zone in which the expert judgment of the administrative agency will not be disturbed, regardless of whether it finds or rejects attributability to the employment."

6 Schneider, Workmen's Compensation Text (Perm. ed.) § 1542 (a), expresses the difficulty thus:

"* * * no exact formula can be laid down which will automatically solve every case, and the 'tendency appears to be not to limit or confine the scope' of the words 'except in catholic terms.' "

See, also, Riesenfeld and Maxwell, Modern Social Legislation, 235; Brown, *"Arising out of and in the Course of the Employment" in Workmen's Compensation Acts*, 7 Wis. L. Rev. 15; Horovitz, Workmen's Compensation, 93, *et seq.*

We early recognized the difficulty of formulating a comprehensive definition. In Novack v. Montgomery Ward & Co. 158 Minn. 495, 498, 198 N. W. 290, 292, we said:

"We have heretofore declined to attempt to give a comprehensive definition of this language which should include all cases embraced therein and with precision exclude those outside of its terms. We shall not attempt to do so now. It is sufficient to say that each case that comes to us must stand on its own facts."

These difficulties are particularly noticeable in cases such as the one we now have before us, where an injured employe acts in an emergency in an attempt to prevent harm to some other person. The case most frequently cited and that principally relied upon by claimant is O'Leary v. Brown-Pacific-Maxon, Inc. 340 U. S. 504, 71 S. Ct. 470, 95 L. ed. 483. In that case, Brown-Pacific-Maxon, Inc., was a government contractor on the island of Guam. The company maintained for its employes a recreation center near the shore line, along which ran a channel so dangerous for swimmers that its use was forbidden and signs to that effect were erected. John Valak, an employe, was waiting at the center to catch a bus to take him from the area when he saw or heard two men standing on the reefs beyond the channel signaling for help. Followed by nearly 20 others, he plunged into the water to effect a rescue. He was drowned in attempting to swim the channel. A claim was filed by his dependent mother for compensation under the Longshoremen's and Harbor Workers' Compensation Act, which authorizes payment of compensation for "accidental injury or death arising out of and in the course of employment." 44 Stat. 1425, § 2(2), 33 U. S. C. § 902(2), 33 USCA, § 902(2). Compensation was allowed by the deputy commissioner. The district court denied a petition to set aside the award. On appeal, the court of appeals for the ninth circuit reversed. The United States Supreme Court, in reversing the circuit court (Justices Minton, Jackson, and Burton dissenting), said (340 U. S. 506, 71 S. Ct. 471, 95 L. ed. 486):

"* * * The test of recovery is not a causal relation between the nature of employment of the injured person and the accident. * * * Nor is it necessary that the employee be engaged at the time of the injury in activity of benefit to his employer. All that is required is that the 'obligations or conditions' of employment create the 'zone of special danger' out of which the injury arose. * * * A reasonable rescue attempt, like pursuit in aid of an officer making an arrest, may be 'one of the risks of the employment, an incident of the service, foreseeable, if not foreseen, and so covered by the statute.' "

The court recognized that there may be cases where an employe, in attempting to help another, may go too far from his employment. In that respect the court said (340 U. S. 507, 71 S. Ct. 472, 95 L. ed. 486) :

"* * * This is not to say that there are not cases 'where an employee, even with the laudable purpose of helping another, might go so far from his employment and become so thoroughly disconnected from the service of his employer that it would be entirely unreasonable to say that injuries suffered by him arose out of and in the course of his employment.' Matter of Waters v. Taylor Co., 218 N. Y. at 252, 112 N. E. at 728. We hold only that rescue attempts such as that before us are not necessarily excluded from the coverage of the Act as the kind of conduct that employees engage in as frolics of their own."

The O'Leary case is characterized by Professor Riesenfeld as one of those falling within the "twilight zone in which the expert judgment of the administrative agency" should control. 35 Minn. L. Rev. 525, 544. It is apparent that the court based its decision on the same proposition. In that respect the court said (340 U. S. 508, 71 S. Ct. 472, 95 L. ed. 487) :

"We are satisfied that the record supports the Deputy Commissioner's finding. The pertinent evidence was presented by the written statements of four persons and the testimony of one witness. It is, on the whole, consistent and credible. From it the Deputy Commissioner could rationally infer that Valak acted reasonably

in attempting the rescue, and that his death may fairly be attributable to the risks of the employment. *We do not mean that the evidence compelled this inference; we do not suggest that had the Deputy Commissioner decided against the claimant, a court would have been justified in disturbing his conclusion.* We hold only that on this record the decision of the District Court that the award should not be set aside should be sustained." (Italics supplied.)

See, also, Davis, Administrative Law, § 244, p. 873.

In the case now before us, it must be kept in mind that the decision of the industrial commission is the opposite of that of the deputy commissioner in the O'Leary case. The cases may also be distinguished on their facts. The O'Leary case is based on the finding that the "obligations or conditions" of employment created the "zone of special danger" out of which the injury arose. The dangerous channel where the employe there lost his life was immediately adjacent to the recreation center provided by the employer for the use of its employes. It might reasonably be anticipated that someone would venture into the zone of special danger and that those using the recreation center might go to their rescue. But in the case now before us it can hardly be said that the employer should be held to have contemplated that the entire area bordering the route of the truck driver would be a zone of special danger and that the employment of driving a truck would encompass the duty, and consequent risk, of going to the aid of anyone found to be in a position of danger along the entire route.

In its opinion in the O'Leary case, the court cites and relies on Matter of Babington v. Yellow Taxi Corp. 250 N. Y. 14, 164 N. E. 726, 61 A. L. R. 1354, and Puttkammer v. Industrial Comm. 371 Ill. 497, 21 N. E. (2d) 575.

In the Babington case, the employe met his death while employed as a taxi driver. While so engaged, a police officer jumped on the running board of his taxi and ordered him to pursue another car in order that its occupant might be arrested. Another vehicle suddenly cut across the path of the taxi and a collision occurred, re-

sulting in Babington's death. After discussing the duty of a citizen to aid an officer, the New York court, in sustaining a recovery, said (250 N. Y. 17, 164 N. E. 727):

"* * * In sending Babington upon the highway, it [the employer] knew or is chargeable with knowledge that man and car alike would have to answer to the call. An officer may not pause to parley about the ownership of a vehicle in the possession of another when there is need of hot pursuit. In so far as the danger of pursuit was a danger incidental to the management of the car, it was one of the risks of the employment, an incident of the service, foreseeable, if not foreseen, and so covered by the statute," citing Matter of Waters v. William J. Taylor Co. 218 N. Y. 248, 112 N. E. 727, L. R. A. 1917A, 347.

In the Waters case, the injured employe found the employe of another contractor, who was employed on a common undertaking, endangered and went to his assistance, whereupon he, himself, was injured and subsequently died. The court based the right to recover in that case on a humanitarian principle, saying (218 N. Y. 251, 112 N. E. 728):

"* * * there is a moral duty resting on principles of humanity and those principles ought to apply to a contract of employment and broaden its scope so as to permit a servant to do as Waters did in attempting to rescue a fellow-workman although technically working for a different employer."

Apparently, the New York court carried the above proposition one step further in the Babington case, permitting recovery even though the rescue did not involve a workman who was a "fellow-workman."

In contrast to the Babington case, it is interesting to examine Kennelly v. Stearns Salt & Lbr. Co. 190 Mich. 628, 157 N. W. 378. In that case, a construction employe was called upon to assist in fighting a forest fire under the command of a fire warden in compliance with a statute making it a misdemeanor to disobey without reasonable justification such an order. The Michigan court, in

denying a right to compensation under the workmen's compensation law, said (190 Mich. 630, 157 N. W. 379):

"* * * It would hardly be contended that if he were impaneled to sit on a jury and had met some accident while engaged in that service his employer would be liable therefor. Nor could that contention be made had claimant been injured while assisting the sheriff at his command in quelling a riot. We think this situation is no different. When he was ordered to go with the fire warden, he left his work temporarily to discharge a duty which was incumbent upon him as well as upon every other citizen similarly situated. We do not think it can be said that his injury arose out of his employment or during the course of it."

In the other case cited by the United States Supreme Court in the O'Leary case, namely, Puttkammer v. Industrial Comm. 371 Ill. 497, 21 N. E. (2d) 575, the injured employe was engaged as a truck driver. While returning from delivering a load of coal, he came to a street that was obstructed by two automobiles which had been involved in a collision. He pulled to the side of the road and went to the damaged cars. He there picked up an injured child and was returning to his truck when another automobile struck one of the damaged cars and pushed it against him, causing the injury which resulted in his death. The Illinois statute, like ours, provides for compensation for injuries "arising out of and in the course of the employment." In upholding the grant of compensation, the Illinois court, after discussing the Waters and Babington cases and others, said (371 Ill. 503, 505, 21 N. E. [2d] 578):

"* * * Giving aid to an injured child on the highway is just as natural and is just as much to be expected from a driver of another vehicle as stopping to water horses drawing his dray or stopping to get liquid refreshment for himself.

* * * * *

"These decisions indicate that there is no break in the employment where the thing done was natural and foreseeable. Whether Puttkammer went to see whether he could pass the damaged auto-

mobiles safely or to lend aid to the injured child he was carrying when struck and killed, both acts were foreseeable and it is immaterial whether they were foreseen or not."

Decisions involving acts done when employes were confronted with emergencies may be found which seemingly would support a holding either granting or denying compensation. It is apparent that by recent decisions there has been a change toward liberality in awarding compensation. Cf., for instance, Bohlen, *A Problem in the Drafting of Workmen's Compensation Acts* (1912) 25 Harv. L. Rev. 401, 416, and Horovitz, Workmen's Compensation (1944) 117.

Illustrative of emergency cases, aside from those cited above, allowing or disallowing compensation are the following:

Schulz v. Industrial Comm. 254 Wis. 578, 36 N. W. (2d) 683. The employe truck driver was killed when going to investigate what he thought was an accident. His instructions were to render what assistance he could in highway emergencies. The court held that such assistance was an enlargement of the scope of his employment.

Herman v. Follmer Trucking Co. 129 Pa. Super. 447, 195 A. 632. A truck driver went to the assistance of injured persons. Instructions to render aid under such circumstances were held to require the employe to do what he did.

Ocean A. & G. Corp. Ltd. v. Industrial Accident Comm. 180 Cal. 389, 182 P. 35. The employe was hurt on his employer's premises when attempting to rescue a child who had been nearly run down by the employer's automobile. It was held that the act done was within the scope of things which reasonably might be expected of him, particularly in view of the fact that the employer would suffer had the child been hurt.

Transport Co. of Texas v. Arkansas Fuel Oil Co. 210 Ark. 862, 198 S. W. (2d) 175. Employe was killed while returning from a mission to aid a stalled truck. It was thought that the truck contained merchandise destined for deceased's employer, so it was held that he remained within the scope of his employment.

Oklahoma Ry. Co. v. Cannon, 198 Okl. 65, 176 P. (2d) 482. A bus driver was injured while clearing the road of a car which had become entangled in a guy wire, despite instructions not to aid in such cases. It was held that the acts performed were reasonably incidental to the work of the employe.

Short v. Kerr, 104 Ind. App. 118, 9 N. E. (2d) 114. A passerby was entangled by a falling tree. The foreman of the workmen who felled the tree went to the assistance of the stranger and was electrocuted by a high-tension line caught in the tree. The court upheld the award on the principle of humanitarianism, following Matter of Waters v. William J. Taylor Co. 218 N. Y. 248, 112 N. E. 727, L. R. A. 1917A, 347, *supra.*

In the following cases compensation was denied:

Edwards v. Louisiana Forestry Comm. (La. App.) 49 So. (2d) 53. A towerman saw a child on the ground near the tower being attacked by a dog and was injured while descending the tower for the purpose of aiding the child. Compensation was denied because such act was not part of his duties and did not benefit the employer.

Matter of Priglise v. Fonda, etc., R. Co. 192 App. Div. 776, 183 N. Y. S. 414. A flagman working at a railroad crossing was killed when going to the assistance of children endangered on the tracks of another road which ran near the place where the employe was working. The court praised his heroism, but held that the link connecting the employment to the accident was missing and that the injury was not compensable.

Sichterman v. Kent Storage Co. 217 Mich. 364, 186 N. W. 498, 20 A. L. R. 309. A salesman got out of his car to help an injured peddler and was himself killed. The accident was held not compensable as being beyond the duties of the employe. Many of the cases up to that time were analyzed by the court. This holding was reaffirmed in the later case of Feiber v. Leonard, Ralph & Jones, 284 Mich. 381, 279 N. W. 870. See, also, Annotations, 6 A. L. R. 1247, and 50 A. L. R. 1148.

Most of the cases upholding an award find justification in some act of the injured employe which is found to be incidental to the employment. Those involving injuries sustained by truck drivers and other operators of vehicles while assisting or attempting to assist persons found injured or in place of peril on the highway generally hold that such assistance is either required of the employe by the employer or is incidental to the nature of the employment. While it might be said that injuries sustained by a truck driver while going to the assistance of persons involved in accidents or otherwise seen to be in a place of danger on a highway are incidental to his employment as a truck driver, the question before us is: Can it be said that assistance to any person observed to be in peril off the highway, regardless of the distance separating such person from the highway, is incidental to the employment so long as such person is within the range of the employe's vision?

In Brusven v. Ballord, 217 Minn. 502, 504, 14 N. W. (2d) 861, 862, we quoted the following from Novack v. Montgomery Ward & Co. 158 Minn. 495, 498, 198 N. W. 290, 292:

"* * * It [the injury] 'arises out of' the employment when it reasonably appears from all the facts and circumstances, that there is a causal connection between the conditions which the employer puts about the employe and the resulting injury. If the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment."

Had the employe in the instant case been riding alone when he went to the assistance of the third person, we would have no difficulty in holding that his death did not arise "out of" his employment. The evidence would not sustain a finding that he was instructed to render assistance to persons in peril, nor could it be said that rendering such assistance was incidental to his employment or that it could have been contemplated by reasonable persons that he would expose himself to the risk of so doing as an incident to the employment in which he was engaged. Claimant contends

that, even if this is so, the employer extended the scope of the employment by directing his employe to render assistance to the person discovered to be in peril. The only evidence bearing on this contention is the testimony of employer quoted above.

That an employer who directs or requests his employe to perform some act outside the usual scope of his employment may thereby extend the scope of the employment cannot well be denied. In O'Rourke v. Percy Vittum Co. 166 Minn. 251, 257, 207 N. W. 636, 638, we said:

"* * * an employer may enlarge or extend the scope of the employment; and an employe who, at the direction of his employer or of a superior to whose orders he is subject, performs services outside the duties of his usual employment, and performs them in consequence of the existence of the relation of employer and employe and as incidental to the employment, is within the protection of the act while performing such services."

In Ridler v. Sears, Roebuck & Co. 224 Minn. 256, 261, 28 N. W. (2d) 859, 862, after distinguishing the O'Rourke and other cases of similar import, we said in denying recovery:

"It is apparent that when the employe here, without either express or implied instructions from his employer, or anyone representing the latter, voluntarily left his employment to perform services exclusively for the benefit of a third party, he removed himself for the time being from the protection of the compensation act, and that the injury he sustained in performing such voluntary services for another did not arise out of, nor was it incidental to, the services or employment for which he was engaged by his employer."

See, also, Thompson v. George E. Thompson Co. Inc. 198 Minn. 547, 270 N. W. 594; Stepan v. J. C. Campbell Co. 228 Minn. 74, 36 N. W. (2d) 401; 7 Schneider, Workmen's Compensation Text (Perm. ed.) § 1660. See, also, Id. §§ 1646, 1650.

Here, it is clear that there was no express direction to the employe to go to the aid of the third person. At best, the employer

inquired of the employe whether they should not do so. Whether a direction can be implied from such request depends on the inference to be drawn from the language used by the employer. It was for the industrial commission to draw such inference, and its determination thereof should not be disturbed if there is support for it in the record. O'Leary v. Brown-Pacific-Maxon, Inc. 340 U. S. 504, 71 S. Ct. 470, 95 L. ed. 483, *supra;* Le Bar v. Ewald Bros. Dairy, 217 Minn. 16, 13 N. W. (2d) 729. We believe that the evidence amply supports the finding of the commission.

Affirmed.

THOMAS GALLAGHER, JUSTICE (dissenting).

I am of the opinion that the words and actions of the employer can be construed only as definitely enlarging the usual scope of decedent's employment.

It is to be recalled that employer testified:

"A. * * * I don't remember the exact words but the sum and substance was, I said: 'There is a man in the lake', and I believe that I—I am not positive now, it has been a long time; seems to me I said, *'We better stop'.*

\* \* \* \* \*

"A. Something like that." (Italics supplied.)

That decedent then stopped the truck and jumped out and "was clear over in the lake when I got there." He further testified that he followed decedent out on the lake and actually directed him in the rescue operations, as follows:

"A. Well, I see the ice was kind of shaky so I told him he better come to shore, over where the ice was thicker, and as he turned, why, then he broke through."

When asked what he had in mind when he directed decedent to stop, he testified:

"A. * * * I suppose help is about what anybody would naturally have in mind when you see somebody drowning.

"Q. You had in mind trying to save a life?

"A.   I suppose that was probably the idea.   It wouldn't be curiosity."

It is clear from the foregoing (1) that employer directed decedent to stop the truck with the intent of rescuing the man in the water; (2) that employer accompanied decedent on this project; and (3) that while decedent was thus engaged he was actually being directed by his employer.   It follows that the general principles set forth in O'Rourke v. Percy Vittum Co. 166 Minn. 251, 257, 207 N. W. 636, 638, cited in the majority opinion, became applicable. Therein it was stated:

"* * * an employer may enlarge or extend the scope of the employment; and an employe who, at the direction of his employer or of a superior to whose orders he is subject, performs services outside the duties of his usual employment, and performs them in consequence of the existence of the relation of employer and employe and as incidental to the employment, is within the protection of the act while performing such services."

The facts outlined distinguish the instant case from Ridler v. Sears, Roebuck & Co. 224 Minn. 256, 28 N. W. (2d) 859, where the employe was engaged in services outside the scope of his employment upon his own volition without directions from his employer or the foreman in charge of his work.

It is my conviction that only one conclusion can be drawn from the evidence referred to above, and that is that employer had definitely enlarged the scope of decedent's employment and that decedent subsequently met death while engaged in such extended employment.

LORING, CHIEF JUSTICE (dissenting).

I agree with the views expressed by Mr. Justice Thomas Gallagher.

FRANK T. GALLAGHER, JUSTICE (dissenting).

I agree with the views expressed by Mr. Justice Thomas Gallagher.